ADVISORY OPINION ON CONSTITUTIONALITY OF 1975 PA 227
(QUESTIONS 2–10)

Docket No. 57850. Argued March 5, 1976 (Calendar No. 11).—Decided
May 21, 1976.

The Supreme Court, responding to a request by the House of
Representatives, issued a per curiam advisory opinion that
Public Act 227 of 1975, regulating political activity, was uncon-
stitutionally enacted because it embraced more than one object.
396 Mich 123 (1976). The Court also considered nine other
specific questions of law concerning the act and issues a further
advisory opinion on each question:

Question 2: The section of the act (§ 40) which prohibits publiciz-
ing by "any person" of any information relative to a sworn
complaint alleging violation of the act or of rules promulgated
under the act is constitutionally infirm as an infringement
upon freedom of speech and the press. The Legislature may
impose confidentiality upon members and personnel of the
Political Ethics Commission and upon its records and proceed-
ings (§ 38), but it is fundamental to our system of government
that the voters be provided with the information to make
informed choices of candidates, and § 40 of the act impermissi-
bly restricts the freedom of speech and the press to provide

REFERENCES FOR POINTS IN HEADNOTES

[1, 35, 36] 16 Am Jur 2d, Constitutional Law § 11.

20 Am Jur 2d, Courts §§ 75, 210.

Power of Legislature, absent constitutional provision in that regard,
to authorize or require court or justices thereof to render advis-
ory opinion upon request of governor or of either house of
Legislature, 103 ALR 1087.

[2–4] 16 Am Jur 2d, Constitutional Law §§ 342, 343, 345–347, 349.

[5] 25 Am Jur 2d, Elections § 116 *et seq.*

[6, 7] 16 Am Jur 2d, Constitutional Law § 258.

[8–16, 19–23, 25, 27–30] 26 Am Jur 2d, Elections § 280 *et seq.*

[17, 18] 16 Am Jur 2d, Constitutional Law § 167.

[24] 16 Am Jur 2d, Constitutional Law § 506 *et seq.*

[26] 62 Am Jur 2d, Privacy §§ 4, 43.

[31–33] 51 Am Jur 2d, Lobbying § 1 *et seq.*

[34] 51 Am Jur 2d, Lobbying § 14.

that information. There are no "compelling state interests" sufficient to justify the substantial restrictions imposed.

Section 40 of statute unconstitutional.

Question 3:

1. The requirement in the act for a specific organizational structure for campaigns is a constitutional regulation of the conduct of elections.

2. Limitations on expenditures for campaigns and on expenditures by individuals and committees are unconstitutional because of their direct infringement on freedom of speech.

3. Limitation of contributions by persons and committees to candidate committees are constitutional except on those made by a candidate and family to the candidate's committee. The potential for abuse inherent in the contribution of large sums of money could be avoided by the limitation and this purpose outweighs the constitutional rights of independent contributors, who could make limited contributions as a symbolic political expression and remain free to discuss the candidates and issues.

4. Disclosure and record-keeping requirements are constitutional as to promotion of or opposition to both a candidate and a ballot question. The governmental interests which justify the disclosure requirements include: (1) informing the public of the source of campaign money and its use; (2) deterrence of actual corruption and the avoidance of the appearance of corruption by bringing publicity to large contributions; (3) providing data to be used in the detection of violations of contribution limitations.

Sections 61, 83, 84 and 91 declared unconstitutional. Section 93 declared constitutional except that subsection (6) is declared unconstitutional and no determination is made as to the validity of subsection (7).

Question 4: Contributions or expenditures by a corporation for the purpose of influencing the nomination or election of a candidate may be constitutionally prohibited in order to preserve the integrity of the electoral process, and the prohibition is not a denial of equal protection of the laws. However, prohibition of contributions or expenditures for the purpose of influencing the qualification, passage, or defeat of a ballot question in § 95 of the act is an unconstitutional abridgment of freedom of speech and press. Political expression must be afforded the broadest protection in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people. Expenditures by

corporations to communicate their opinions concerning ballot questions serve to enlighten the public and encourage an informed decision-making process. The extent to which the Constitution protects the right of corporations to freely express their ideas in other contexts is not decided.

Section 95 declared unconstitutional in part.

Question 5: Public financing of gubernatorial elections in § 101 of the act is not an appropriation for a local or private purpose, and thus did not require a two-thirds majority in both houses of the Legislature for passage under Const 1963, art 4, § 30. Given the broad powers of the Legislature to determine public purpose and the clear relationship between the goals of § 101 of the act and the public welfare, the fact that certain individuals benefit from the appropriation does not imply that the appropriation lacks a public purpose.

Section 101 declared a public appropriation.

Question 6: The establishment of a state campaign fund to finance gubernatorial campaigns in § 101 of the act constitutes an appropriation bill which is invalid under the constitution in that it was enacted prior to certain general appropriations. Furthermore, the act purports to create a continuing appropriation for the fund which extends beyond the fiscal year and conflicts with the budgetary procedure required by the Constitution. Appropriations are necessarily made on a year-to-year basis and there can be an appropriation to the state campaign fund only for the ensuing fiscal year.

Section 101 declared unconstitutional as a non-budget appropriation enacted prior to general appropriation bills.

Question 7: The financial disclosure requirements for certain named officials in §§ 131 and 132 of the act violate the Equal Protection Clause as an overbroad classification. There is no single thread connecting all the named officials: they are grouped without regard to their function or jurisdiction. The possibilities for conflicts of interests of these various governmental officials are of different proportions depending upon their relative spheres of influence and the information they are required to disclose should reflect this fact. Financial disclosure requirements, appropriately narrow and precise, are constitutionally permissible.

Sections 131 and 132 declared unconstitutional.

Question 8: There is no conflict between the financial disclosure requirements for certain named officials in §§ 131 and 132 of the act and a section of the Constitution giving the oath of office and prohibiting any other oath as a requirement for

public office. The disclosure provisions do not require a potential candidate to form a belief or choose between differing thoughts.

Sections 131 and 132 declared not to violate Const 1963, art 11, § 1.

Question 9: The requirements imposed on lobbyists in chapter 5 involving direct communication may be compared with provisions of the Federal Regulation of Lobbying Act and are sufficiently specific in describing the types of communication regulated and the actions they are directed toward which require disclosure to withstand a challenge as a vague regulation of a fundamental right. The chapter is not manifestly overbroad, and is limited to the least intrusive method of regulation, so long as it is construed as limited to solicitation by those persons employed to affect the legislative and administrative process directly and not to cover citizens' consultations with each other. The validity of the restraints placed upon such solicitation, however, is more appropriately tested in the factual context of an actual case or controversy.

Question 10: The regulation of lobbyists in chapter 5 requires special registration and disclosure by a defined class of persons, with exceptions for political parties, religious organizations, and persons whose annual expenditure or compensation for lobbying is $1,000 or less. Political parties have long been subject to distinct and separate regulatory treatment, and religious groups have traditionally been accorded special constitutional status. In the absence of a factual controversy the $1,000 threshold is not wholly without rationality. Chapter 5 does not deny lobbyists equal protection of the laws.

Chapter 5 declared constitutional.

Chief Justice Kavanagh, with Justice Ryan, dissented on the ground that the expression of a further opinion is inappropriate after the Court has expressed the opinion that the legislation is ineffective as violating the one-object limitation in the Constitution.

Justice Levin dissented on the ground that in expressing an opinion in a matter on the legislative agenda the Supreme Court becomes involved in the legislative process contrary to the intention of the Constitution.

OPINION OF THE COURT

1. COURTS—CONSTITUTIONAL LAW—ADVISORY OPINIONS—PRECEDENT.

An advisory opinion is not precedentially binding on the Supreme Court, but is only the opinion of the justices who signed it.

2. CONSTITUTIONAL LAW—STATUTES—POLITICAL REFORM ACT—POLITICAL ETHICS COMMISSION—COMPLAINTS—CONFIDENTIALITY.

A section of a political reform act which prohibits publicizing any information relative to a sworn complaint filed with the Political Ethics Commission and makes violation a felony is constitutionally infirm as an infringement upon freedom of speech and the press (Const 1963, art 1, § 5; 1975 PA 227, § 40).

3. CONSTITUTIONAL LAW—FREEDOM OF SPEECH—FREEDOM OF THE PRESS.

Freedom of speech and of the press have their limitations and are not absolute rights; however, when the state seeks to restrict them, it must show a compelling state interest in protecting or implementing the common good.

4. CONSTITUTIONAL LAW—FREEDOM OF SPEECH—PUBLIC OFFICIALS.

Possible injury to the reputation of a public official does not afford a constitutional basis for repressing speech.

5. CONSTITUTIONAL LAW—POLITICAL REFORM ACT—POLITICAL ETHICS COMMISSION—COMPLAINTS—CONFIDENTIALITY.

Restrictions imposed by a political reform act on the publicizing by persons other than members and personnel of a Political Ethics Commission of complaints filed before the commission are not shown to be justified by a compelling state interest because publication of the information does not pose an imminent threat to the administration of its proceedings since there is no jury to be prejudiced by pretrial publicity and the commission members should be capable of making independent determinations (1975 PA 227, § 40).

6. CONSTITUTIONAL LAW—ELECTIONS—STATUTES—POLITICAL REFORM ACT—CAMPAIGNS—ORGANIZATION.

The organizational structure for political campaigns provided in a political reform act lies within permissible limits of the Legislature's power to regulate the conduct of elections (1975 PA 227, ch 2).

7. CONSTITUTIONAL LAW—ELECTIONS—REGULATION.

Regulation of elections is a permissible legislative activity; however, such legislation must be examined closely when it infringes on fundamental freedoms guaranteed by the United States and Michigan Constitutions (US Const, Am I; Const 1963, art 1, §§ 1, 3, 5, art 2, § 4).

8. CONSTITUTIONAL LAW—FIRST AMENDMENT—POLITICAL EXPRESSION.

Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by the Constitution; the First Amendment affords the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people (US Const, Am I).

9. CONSTITUTIONAL LAW—STATUTES—POLITICAL REFORM ACT—CAMPAIGN EXPENDITURES—LIMITATION—FIRST AMENDMENT.

Provisions of a political reform act which impose expenditure limits upon political campaigns, which fix ceilings upon expenditures by individuals and committees and which refer to expenditure limits are unconstitutional because they directly infringe on First Amendment freedom of speech (US Const, Am I; 1975 PA 227, §§ 61, 83, 84, 91).

10. CONSTITUTIONAL LAW—STATUTES—POLITICAL REFORM ACT—CAMPAIGN CONTRIBUTIONS—LIMITATION—FREEDOM OF SPEECH.

A limitation on the amount that any person, other than the candidate or his family, or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free speech, because it permits the symbolic expression of support evidenced by a contribution and does not infringe the contributor's freedom to discuss candidates and issues; the great potential for abuse inherent in the contribution of large sums of money could be avoided by the limitation and the purpose served by limiting contributions outweighs the constitutional rights which would be infringed (1975 PA 227, § 93).

11. CONSTITUTIONAL LAW—STATUTES—POLITICAL REFORM ACT—CAMPAIGN CONTRIBUTIONS—LIMITATION.

Limitation of contributions to candidate committees is constitutional except for contributions made by a candidate and family to his own candidate committee (1975 PA 227, § 93).

12. CONSTITUTIONAL LAW—STATUTES—POLITICAL REFORM ACT—DISCLOSURE.

Required disclosure and record-keeping of contributions and expenditures on behalf of candidates or ballot questions are constitutional because there is a governmental interest in (1) informing the public of the source of campaign money and its use; (2) deterring actual corruption and avoiding the appearance of corruption by bringing publicity to large contributions; and (3)

providing data to be used in the detection of violations of contribution limitations.

13. CONSTITUTIONAL LAW—STATUTES—POLITICAL REFORM ACT—CORPORATIONS—CONTRIBUTIONS—CANDIDATES.

The Legislature can exercise its power to insure the integrity of the elective process by prohibiting any contributions or expenditures by a corporation for the purpose of influencing the nomination or election of a candidate; the state's interest in preserving the elective process by preventing the use of corporate funds to impose undue influence upon elections justifies the interference with the free expression of an artificial entity (1975 PA 227, § 95).

14. CONSTUTIONAL LAW—STATUTES—POLITICAL REFORM ACT—CONTRIBUTIONS TO CANDIDATES—CORPORATIONS—EQUAL PROTECTION.

A prohibition against contributions or expenditures by a corporation for the purpose of influencing the nomination or election of a candidate does not violate the Equal Protection Clause; a statute is not unconstitutional because it might have gone further than it did and reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the Legislature (Const 1963, art 1, § 2).

15. CONSTITUTIONAL LAW—CORPORATIONS—CONTRIBUTIONS—BALLOT QUESTIONS.

Expenditures by corporations for communication of opinions about public issues are constitutionally protected; political expression must be afforded the broadest protection to assure the unfettered interchange of ideas to bring about political and social changes desired by the people (Const 1963, art 1, § 5; 1975 PA 227, § 95).

16. CONSTITUTIONAL LAW—ELECTIONS—CORPORATIONS—CONTRIBUTIONS—BALLOT QUESTIONS.

Prohibition of contributions or expenditures by corporations for the purpose of influencing the qualification, passage, or defeat of a ballot question is an unconstitutional abridgment of freedom of speech and the press (Const 1963, art 1, § 5).

17. CONSTITUTIONAL LAW—STATUTES—APPROPRIATIONS—PUBLIC PURPOSE.

The determination of what constitutes a public purpose for which an appropriation of public money may be enacted upon a vote of less than two-thirds of the members of each house is primarily the responsibility of the Legislature (Const 1963, art 4, § 30).

18. CONSTITUTIONAL LAW—STATUTES—APPROPRIATIONS—PUBLIC PUR-
POSE.

The fact that certain individuals benefit from an appropriation
does not necessarily imply that the appropriation is lacking in
a public purpose; the question is whether society at large has
an interest in having those individuals benefited (Const 1963,
art 4, § 30).

19. CONSTITUTIONAL LAW—ELECTIONS—POLITICAL REFORM ACT—CAM-
PAIGN FINANCING.

The Legislature has determined that public financing of cam-
paigns for gubernatorial elections is for the general welfare of
the public and it is well within the Legislature's power so to
determine (1975 PA 227, § 101).

20. CONSTITUTIONAL LAW—STATUTES—POLITICAL REFORM ACT—CAM-
PAIGN FINANCING—PUBLIC PURPOSE.

A section of a political reform act providing for public financing
of campaigns for gubernatorial elections does not constitute an
appropriation for a local or private purpose, and thus does not
require a two-thirds majority in each house for passage (Const
1963, art 4, § 30; 1975 PA 227, § 101).

21. CONSTITUTIONAL LAW—STATUTES—POLITICAL REFORM ACT—AP-
PROPRIATIONS—CAMPAIGN FINANCING.

A political reform act is an appropriation bill which requires an
appropriation to carry out its purpose where one purpose of the
act is to finance gubernatorial election campaigns with state
funds through a voluntary check-off system from the state
income tax, to establish a campaign fund through the transfer
of an amount equal to the sum checked off by taxpayers to that
fund, and to grant authority to the state treasurer to issue
warrants on the campaign fund to qualified gubernatorial
candidates (Const 1963, art 4, § 31; 1975 PA 227, § 101).

22. CONSTITUTIONAL LAW—STATUTES—POLITICAL REFORM ACT—AP-
PROPRIATIONS—CAMPAIGN FINANCING.

A political reform act which contains an appropriation bill to
finance gubernatorial election campaigns is invalid where it
was passed prior to the passage of general appropriation bills
for the succeeding fiscal period, contrary to the requirement of
the Constitution (Const 1963, art 4, § 31; 1975 PA 227, § 101).

23. CONSTITUTIONAL LAW—STATUTES—POLITICAL REFORM ACT—AP-
PROPRIATIONS BILL—ELECTIONS—STATE CAMPAIGN FUND.

A political reform act which contains an appropriation bill to
finance gubernatorial election campaigns through the creation

of a state campaign fund could only serve as an appropriation for the ensuing fiscal year; a provision which purports to make amounts appropriated available for distribution without fiscal year limitation until December 31 immediately following a gubernatorial general election is a continuing appropriation, and the Constitution necessarily requires appropriations be made year-to-year (Const 1963, art 4, § 31; 1975 PA 227, § 101).

24. CONSTITUTIONAL LAW—STATUTES—EQUAL PROTECTION—OVER-BROAD CLASSIFICATION.

The question that must be answered in a challenge to a statute as making an overbroad classification is whether the state's grouping of all individuals into a single class is rationally related to the furtherance of a legitimate state interest.

25. CONSTITUTIONAL LAW—STATUTES—POLITICAL REFORM ACT—PUBLIC OFFICIALS—FINANCIAL DISCLOSURE.

Financial disclosure requirements for certain named public officials in a political reform act violate the Equal Protection Clause as an overbroad classification where the named officials include individuals with vastly differing areas of responsibility and influence, and totally differing constituencies, both as to size and geographical location (1975 PA 227, §§ 131, 132).

26. CONSTITUTIONAL LAW—RIGHT TO PRIVACY—STATE INTEREST.

The right to privacy includes certain activities which are fundamental to our concept of ordered liberty; they can be abridged by governmental action only where there exists a compelling state interest, the abridgment is shown to be necessary to the accomplishment of the state interest, and the abridgment is accomplished by the least intrusive method.

27. PRIVACY, RIGHT OF—CONSTITUTIONAL LAW—PUBLIC OFFICIALS—FINANCIAL DISCLOSURE—STATE INTEREST.

Disclosure of pertinent financial affairs of specified public officials is necessary to further a legitimate and compelling state interest to provide a means for effectively investigating possible conflicts of interest, promote integrity, fairness and public confidence in government, and provide citizens with information concerning an officeholder's integrity and fitness for office.

28. CONSTITUTIONAL LAW—STATUTES—POLITICAL REFORM ACT—PUBLIC OFFICIALS—FINANCIAL DISCLOSURE.

Financial disclosure requirements of a political reform act mandate production of information which is not necessarily related to achieving the state interests involved and is unconstitutional as an overbroad regulation for those minor officials whose

sphere of influence is geographically limited or whose functions are routine and ministerial (1975 PA 227, § 132).

29. SEARCHES AND SEIZURES—PUBLIC OFFICIALS—FINANCIAL DISCLOSURE.

Assuming that compelled disclosure of the financial affairs of certain public officials is a search, it would be a reasonable search if it is accomplished by the least intrusive method of disclosure.

30. CONSTITUTIONAL LAW—STATUTES—POLITICAL REFORM ACT—PUBLIC OFFICIALS—FINANCIAL DISCLOSURE.

There is no conflict between sections of a political reform act requiring certain public officials to disclose their personal financial affairs and the section of the Constitution which provides the oath of office for all legislative, executive and judicial officers and that no other oath be required as a qualification for any public office (Const 1963, art 11, § 1; 1975 PA 227, §§ 131, 132).

31. CONSTITUTIONAL LAW—STATUTES—POLITICAL REFORM ACT—LOBBYING—VAGUENESS.

A chapter of a political reform act which regulates lobbying activity is sufficiently specific to withstand a challenge that it is unconstitutionally vague where the act requires disclosures of those engaged in (1) communicating directly with an executive branch or legislative official, or (2) soliciting others to such communication, (3) communicating for the purpose of influencing administrative action, and (4) spending more than $1,000 in a 12-month period for these purposes, and the act describes the types of communication regulated more specifically than a Federal act which has been declared constitutional by the United States Supreme Court (60 Stat 812, 839; 2 USC §§ 261–270; 1975 PA 227, ch 5).

32. CONSTITUTIONAL LAW—STATUTES—POLITICAL REFORM ACT—LOBBYING.

A chapter of a political reform act which regulates "soliciting others to communicate with an official" for the purpose of influencing legislative or administrative action is construed to mean only express and direct requests to so communicate to avoid manifest overbreadth of the regulation (1975 PA 227, ch 5).

33. CONSTITUTIONAL LAW—STATUTES—POLITICAL REFORM ACT—LOBBYING.

The validity of restraints in a political reform act placed upon

"soliciting others to communicate with an official" for the purpose of influencing legislative or administrative action is appropriately tested in the factual context of an actual case or controversy (1975 PA 227, ch 5).

34. CONSTITUTIONAL LAW—STATUTES—POLITICAL REFORM ACT—LOBBYING—EQUAL PROTECTION.

A classification in a political reform act which excepts political parties, religious organizations, and persons whose annual expenditure or compensation for lobbying is $1,000 or less from a chapter of the act regulating lobbying activities does not deny lobbyists the equal protection of the laws (1975 PA 227, ch 5).

DISSENTING OPINION

KAVANAGH, C. J., and RYAN, J.

35. CONSTITUTIONAL LAW—STATUTES—COURTS—ADVISORY OPINION.

*The expression of an advisory opinion by the Supreme Court on the constitutionality of an act is inappropriate where a majority of the Court has previously expressed the opinion that the legislation is ineffective as violating the one-object limitation in the Constitution (Const 1963, art 3, § 8, art 4, § 24; 1975 PA 227).*

DISSENTING OPINION

LEVIN, J.

36. CONSTITUTIONAL LAW—STATUTES—COURTS—ADVISORY OPINION.

*The Constitution permits the Supreme Court to give an advisory opinion as to the constitutionality of legislation only after it has been enacted into law; once an act has been declared by the Court to be unconstitutional, the Court in expressing a further opinion on other questions regarding the constitutionality of a matter again on the legislative agenda becomes involved in the legislative process, contrary to the purpose of the constitutional limitation (Const 1963, art 3, § 8; 1975 PA 227).*

*Frank J. Kelley,* Attorney General, and *Robert A. Derengoski,* Solicitor General.

*Charles D. Hackney, George M. Elworth, Varda N. Fink, Michael J. Hodge,* and *Norbert G. Jaworski,* Assistants Attorney General, in support of constitutionality.

*John D. Pirich,* Assistant Attorney General, in opposition to constitutionality.

Amici Curiae:

*Kenneth J. Guido, Jr.* and *Ellen G. Block* for Common Cause.

*Hyman & Rice* for State Bar of Michigan.

*Gary L. Cowan, Daniel F. Curran* and *Dennis R. O'Connell* for Michigan Consolidated Gas Company.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *James D. Tracy, Nancy C. Kurtz* and *Ted T. Amsden)* for Consumers Power Company.

*Lafferty, Reosti, Papakhian & James* for Socialist Workers Party and CO DEL.

*Keywell & Rosenfeld* for Michigan Press Association.

*Honigman, Miller, Schwartz & Cohn* (by *Avern Cohn, Stanley Siegel,* and *Joseph M. Polito)* and *Downs & Edwards (McClellan, Schlaybaugh & Whitbeck,* of counsel) for Michigan Association of Broadcasters, Michigan State Grange, Michigan Library Association, Michigan Association of School Boards, Michigan Association of State College and University Governing Boards, Michigan Townships Association, Michigan State Building and Construction Trades Council, Michigan Community College Association, Michigan State Chamber of Commerce, Michigan State Farm Bureau, Michigan Association of Counties and County Road Association of Michigan.

*Cozadd, Shangle & Smith* for Michigan Association of Hospital Authorities, Inc.

PER CURIAM. In response to the request by the Legislature, on March 29, 1976 this Court issued an advisory opinion[1] which held 1975 PA 227,[2] the political reform act, unconstitutional in violation of art 4, § 24 of Michigan's Constitution.[3] In that opinion we expressed our intention to issue a subsequent opinion to discuss the remaining nine certified questions contained in House Resolution 248 regarding the constitutionality of various provisions contained within 1975 PA 227. It is the purpose of this opinion to examine those remaining questions.

An advisory opinion is not precedentially binding upon the Court and represents only the opinions of the parties signatory. See *Advisory Opinion re Constitutionality of 1972 PA 294,* 389 Mich 441; 208 NW2d 469 (1973).

A recent decision of the United States Supreme Court reviewing the constitutionality of Federal campaign legislation has provided substantial guidance in our deliberations. *Buckley v Valeo,* 424 US 1; 96 S Ct 612; 46 L Ed 2d 659 (1976).

In our examination we also have been greatly assisted by the fine briefs and oral presentations of the Attorney General and eight amici. Their scholarly contributions are worthy of our highest praise.

The Legislature has undertaken the extremely difficult task of drafting legislation which will

---

[1] *Advisory Opinion on Constitutionality of 1975 PA 227 (Question 1)* 396 Mich 123; 240 NW2d 193 (1976).

[2] MCLA 169.1 *et seq.;* MSA 4.1701(1) *et seq.*

[3] Const 1963, art 4, § 24 provides in pertinent part:

"No law shall embrace more than one object, which shall be expressed in its title."

bring about meaningful political reform without causing unconstitutional intrusion upon the protected rights of the people. With regard to many of the provisions contained in 1975 PA 227 this task has been successfully accomplished. However, other provisions improperly infringe upon constitutional rights and must fall. Still other provisions cannot properly be judged in a factual vacuum and must be tested at a later time.

### CERTIFIED QUESTION II—CONSTITUTIONALITY OF SECTION 40

We are asked in certified question II whether § 40[4] is unconstitutional as an infringement upon freedom of speech and the press as guaranteed by Const 1963, art 1, § 5.

Section 40 of the 1975 PA 227 provides the following prohibition:

"Any person filing or aware of the filing of a sworn complaint according to the provisions of section 38 shall not publicize any information relative to the sworn complaint. A violation of this section shall be subject to penalty contained in section 178 of this act."

This state's Constitution (art 1, § 5) sets forth the following guarantee:

"Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press."

It is our opinion that § 40 is constitutionally infirm.

---

[4] MCLA 169.40; MSA 4.1701(40).

Section 31 of the political reform act[5] creates the Political Ethics Commission (PEC) as an autonomous body within the Department of State. The PEC is made up of six members appointed by the Governor with the advice and consent of the Senate.

Formal complaints alleging violations of the act or rules promulgated under the act may be filed with the commission. Under § 38[6] the commission is charged with investigating these allegations to determine whether a violation has occurred. During the entire period of the investigation all information relating to the complaint, including any documents or reports in the commission's possession, must be held confidential by the PEC. Matters shall be made public by the PEC upon a final determination that a violation has occurred or if the person whose conduct is under investigation requests the information be made available to the public.

In addition to providing for confidential proceedings before the PEC, § 40 of the act provides that "Any person filing or aware of the filing of a sworn complaint * * * shall not publicize any information relative to the sworn complaint". A violation of this section is a felony punishable by a "fine of not more than $10,000.00 or imprison-[ment] for not more than 3 years, or both".[7]

No challenge is made to the Legislature's authority to impose confidentiality upon commission members and personnel, or its records and proceedings. Perhaps, as Amicus Michigan Association of Broadcasters suggests, this veil of secrecy "constitutes the least drastic means for advancing the claimed governmental interests".

---

[5] MCLA 169.31; MSA 4.1701(31).

[6] MCLA 169.38; MSA 4.1701(38).

[7] MCLA 169.178; MSA 4.1701(178).

However, in an effort to augment the confidentiality created by § 38 with the prohibition contained in § 40, the political reform act has improperly imposed restrictions upon the constitutionally protected freedoms of speech and the press.

On its face, § 40 prohibits not only media publication but private communications between two or more persons as well.[8] In addition the prohibition extends for an indefinite duration. By its terms, § 40 prohibits communication of information even after the information has been made public by the commission or the person under investigation has authorized its revelation.

The Attorney General, in his brief in support of the constitutionality of 1975 PA 227, concedes that "A literal interpretation of § 40 appears to intrude upon the constitutional guarantee of free speech". However, he invites this Court to read into the statutes certain time limitations to construe the prohibition against publication of information as in effect only until such time as § 38 permits matters to be made public (i.e. upon final determination of the PEC that violation has occurred or person under investigation requests that information be made public).

Even with the limitation suggested by the Attorney General we do not believe § 40 would pass constitutional muster. If public discussion were banned until after the commission concluded its proceedings, it is very possible that violations of the act would not come to the attention of the public until after the election. Further, if the commission concluded that no violation had occur-

---

[8] The act does not provide a definition of the term "publish". We may presume that the Legislature intended it to be used in its common and ordinary sense. *Hammons v Franzblau,* 331 Mich 572, 574; 50 NW2d 161 (1951). According to Webster's Third New International Dictionary (1971), p 1837, "publish" means "to impart or acknowledge to one or more persons * * * ".

red, it is not clear when, if ever, the person bringing the complaint could make his case before the public.

In electing persons to serve in positions of public trust, it is fundamental to our system of government that the voters be provided with the information necessary to make informed choices. Section 40 restricts freedom of speech and the media and could impede the flow of vital information to the voter.

Of course, the freedom of speech and of the media has its limitations and is not an absolute right. *Near v Minnesota ex rel Olson,* 283 US 697, 708; 51 S Ct 625; 75 L Ed 1357 (1931); *Whitney v California,* 274 US 357, 371; 47 S Ct 641; 71 L Ed 1095 (1927). However, when the state seeks to restrict this right, its efforts must be strictly scrutinized. Former Chief Justice THOMAS M. KAVANAGH, in *Kropf v Sterling Heights,* 391 Mich 139, 157–158; 215 NW2d 179 (1974), set forth the principle to guide our deliberations:

"For the state itself to legislate in a manner that affects the individual right of its citizens, *the state must show that it has a sufficient interest in protecting or implementing the common good, via its police powers, that such private interests must give way to this higher interest.* Different degrees of state interest are required by the courts, depending upon the type of private interest which is being curtailed. *When First Amendment rights are being restricted we require the state to justify its legislation by a 'compelling' state interest."* (Emphasis added.)

Proponents of the constitutionality of § 40 argue that compelling state interests are present. They maintain that confidentiality provided by this section will reduce the possibility that the complaint

system will be abusively used as a means to discredit a candidate or public official with a nonmeritorious complaint. Also they suggest that confidentiality protects against pretrial publicity which could adversely affect an impartial consideration of the complaint and encourages those persons with information to come forward. Finally, they maintain that by keeping matters confidential until it is determined that a violation has occurred it will preserve public confidence in the integrity of the government from being unnecessarily or prematurely diminished.

These are no doubt important considerations but they do not amount to "compelling state interests" sufficient to justify the substantial restrictions imposed by § 40 on the guarantees of free speech and press.

Possible injury to the reputation of a public official does not afford a basis for repressing speech. See *New York Times Co v Sullivan,* 376 US 254, 272; 84 S Ct 710; 11 L Ed 2d 686 (1964). Publication and discussion of information relative to proceedings before the PEC does not pose an imminent threat to the administration of its proceedings. There is no jury to be prejudiced by pretrial publicity and the PEC members should be capable of making independent determinations. Finally, while some measure of the confidentiality maintained by the PEC over its proceedings may help preserve the integrity of governmental institutions, a complete ban on public discussion may well do more to destroy than preserve the public's confidence.

Section 40 was conceived as one means of providing fair and honest elections. However, in seeking to accomplish this noble goal the act has impermissibly infringed upon the freedoms of speech and the press.

CERTIFIED QUESTION III—CAMPAIGN ORGANIZATION,
EXPENDITURE, AND REPORTS

Certified question III asks:

"Is Chapter 2 of Act No 227 of the Public Acts of
1975, which requires a specific organizational structure
for campaigns, limits expenditures and contributions
for promoting or opposing candidates or ballot ques-
tions, and requires reports in violation of §§ 1, 3 or 5 of
article I of the State Constitution of 1963?"[9]

It is our opinion that:

1. The requirement for a specific organizational
structure for campaigns is constitutional.

2. Expenditure limitations as they apply to "per-
sons"[10] as defined within the act are unconstitu-
tional.

3. Limitation of contributions to candidate com-
mittees are constitutional excepting those made by
a candidate and family to his own candidate com-
mittee.

4. Disclosure and record keeping requirements
are constitutional, both as to promotion of or
opposition to a candidate or ballot question.

[9] Const 1963, art 1, §§ 1, 3 and 5 state:

"All political power is inherent in the people. Government is
instituted for their equal benefit, security and protection."

"The people have the right peaceably to assemble, to consult for the
common good, to instruct their representatives and to petition the
government for redress of grievances."

"Every person may freely speak, write, express and publish his
views on all subjects, being responsible for the abuse of such right;
and no law shall be enacted to restrain or abridge the liberty of
speech or of the press."

[10] "(1) 'Person' means a business, individual, proprietorship, firm,
partnership, joint venture, syndicate, business trust, labor organiza-
tion, company, corporation, association, committee, or any other
organization or group of persons acting jointly." MCLA 169.14; MSA
4.1701(14).

1. *Organizational Structure for Campaigns.*

Under Const 1963, art 2, § 4, the Legislature is given the power to regulate the conduct of elections. It provides in pertinent part:

"The legislature shall enact laws to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting."

The organization structure for campaigns provided in chapter 2 lies within permissible limits.

2. *Limitation on Expenditures.*

Subsequent to the request of the Michigan House of Representatives for an advisory opinion, the United States Supreme Court decided *Buckley v Valeo,* 424 US 1; 96 S Ct 612; 46 L Ed 2d 659 (1976), *rev'g in part, aff'g in part,* 171 US App DC 172; 519 F2d 821 (1975), which effectively disposes of the greater part of question III.

This Court has held that First Amendment rights under the Federal Constitution are applicable to the state via the Fourteenth Amendment. *Book Tower Garage, Inc v Local No 415,* 295 Mich 580, 586; 295 NW 320 (1940). Also, the rights endowed under Const 1963, art 1, §§ 1, 3, and 5 are similar to those protected under the First Amendment of the Constitution of the United States.

Although the regulation of elections is a permissible legislative activity, such legislation must be examined closely when it infringes on fundamental freedoms guaranteed by the United States and our state Constitutions.

In *Buckley, supra* 14, the Supreme Court spoke

generally of contribution and expenditure limits before regarding each issue with specificity. The court stated:

"The act's contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people'. *Roth v United States,* 354 US 476, 484 [77 S Ct 1034; 1 L Ed 2d 1498] (1957). Although First Amendment protections are not confined to 'the exposition of ideas,' *Winters v New York,* 333 US 507, 510 [68 S Ct 665; 92 L Ed 840] (1948), 'there is practically universal agreement that a major purpose of th[e] Amendment was to protect the free discussion of governmental affairs, * * * of course includ[ing] discussions of candidates. * * *' *Mills v Alabama,* 384 US 214, 218 [86 S Ct 1434; 16 L Ed 2d 484] (1966)."

The Supreme Court proceeded thereafter to find the limitations of expenditures on behalf of a candidate to be in violation of First Amendment rights because:

"A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event. The electorate's increasing dependence on television, radio, and other

mass media for news and information has made these expensive modes of communication indispensible instruments of effective political speech." (19.)

Three distinctive limitations on expenditures imposed by the Federal act were found to be unconstitutional. Included were limitations on expenditures by candidates from personal or family resources,[11] overall limitations on expenditures by or on behalf of candidates,[12] and the $1,000 limitation on expenditures by "persons".[13]

Four provisions of chapter 2 of the Michigan act must fall in light of the *Buckley* rationale. Sections 83 and 84[14] which impose maximum expenditure limits upon campaigns and § 91[15] which fixes ceilings upon expenditures by individuals and committees are unconstitutional because of their direct infringement on First Amendment freedom of speech. Section 61[16] is defective in its referral to "expenditure * * * limits".

## 3. *Limitation of Contributions.*

Limitations on contributions, however, excepting those made by the candidate and family,[17] were found to be not such a deprivation of free speech. The Court rationalized:

"By contrast with a limitation upon expenditures for political expression, *a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restric-*

[11] 18 USC 608(a)(1).

[12] 18 USC 608(c).

[13] 18 USC 608(e)(1).

[14] MCLA 169.83, 169.84; MSA 4.1701(83), 4.1701(84).

[15] MCLA 169.91; MSA 4.1701(91).

[16] MCLA 169.61; MSA 4.1701(61).

[17] MCLA 169.93(6); MSA 4.1701(93)(6).

*tion upon the contributor's ability to engage in free communication.* A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing. At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate. *A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues.* While contributions may result in political expression if spent by a candidate or an association to present views to the voters, *the transformation of contributions into political debate involves speech by someone other than the contributor."* (20–21.)

In short, the Court found that the great potential for abuse inherent in the contribution of large sums of money could be avoided. The purpose served by limiting contributions outweighed the constitutional rights which were infringed. The Court elaborated, 26–27:

"To the extent that large contributions are given to secure political *quid pro quos* from current and potential office holders, the integrity of our system of representative democracy is undermined. Although the scope of such pernicious practices can never be reliably ascertained, the deeply disturbing examples surfacing after the 1972 election demonstrate that the problem is not an illusory one.

"Of almost equal concern as the danger of actual *quid pro quo* arrangements is the impact of the appearance of corruption stemming from public awareness of the

opportunities for abuse inherent in the regime of large individual financial contributions."

The pertinent provision of 1975 PA 227 concerned with contribution limitations is § 93.[18] The analogous provisions in the Federal act are found in 18 USC 608. Section 93 limits the amount which persons (as defined in the act) and committees may contribute to candidate committees of candidates for state elective office.

However, the Supreme Court did not find similar potential dangers in the contributions of candidates and their families to the candidate's own campaign committee. *Buckley, supra,* found unconstitutional a limitation similar to subsection 93(6) of the Michigan act because it limited political expression and would serve no governmental interest once the limit on independent expenditures was removed. Such abuses as *quid pro quo* or undue pressure are not present in the use of a candidate's own or family funds.

Section 93(7)[19] limits to $1,700 annually aggregate contributions to all committees in support of or in opposition to a candidate "except that this subsection shall not apply to the transfer of funds between an organization and a subsidiary, subunit or affiliate of that organization". The meaning of the exception is obscure. In this factual vacuum, we can make no determination as to validity.

Therefore, we find § 93 to be constitutional, excepting subsections (6) and (7).

### 4. *Disclosure and Record Keeping.*

In *Buckley,* the Supreme Court also dealt with the impact of the compelled disclosure of contribu-

---

[18] MCLA 169.93; MSA 4.1701(93).

[19] MCLA 169.93(7); MSA 4.1701(93)(7).

tions and expenditures on behalf of candidates encompassed by the Federal act.[20] The Supreme Court stated:

"We long have recognized that significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest. Since *Alabama* we have required that the subordinating interests of the State must survive exacting scrutiny. We also have insisted that there be a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed. See *Pollard v Roberts,* 283 F Supp 248, 257 (ED Ark, 1968) (three-judge court), aff'd, 393 US 14 [89 S Ct 47; 21 L Ed 2d 14] (1968). This type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct in requiring disclosure. *NAACP v Alabama, supra,* at 461 [357 US 449; 78 S Ct 1163; 2 L Ed 2d 1488 (1958)]. *Cf. Kusper v Pontikes,* 414 US 51, 57–58 [94 S Ct 303; 38 L Ed 2d 260] (1973)." (64–65.)

The governmental interests espoused by the Supreme Court as justification for the disclosure requirements included: (1) informing the public as to the source of campaign money and its utilization by the candidate; (2) deterrence of actual corruption and the avoidance of the appearance of corruption by bringing publicity to large contributions; (3) providing data to be used in the detection of violations of contribution limitations.

Although ballot questions were not at issue in *Buckley,* the same rationale applies to the reporting and disclosure requirements for contributions and expenditures relative to ballot questions.[21]

[20] 2 USC 431, *et seq.*

[21] *See* MCLA 169.55–169.57, 169.92; MSA 4.1701(55)–4.1701(57), 4.1701(92).

CERTIFIED QUESTION IV—CONSTITUTIONALITY OF
SECTION 95

Certified question IV addresses the constitution-
ality of § 95 of 1975 PA 227.[22] This section prohib-
its the use of corporate contributions[23] or expendi-
tures[24] for the purpose of influencing the nomina-

---

[22] Section 95 of 1975 PA 227 provides:

"(1) Except with respect to the exceptions and conditions in subsec-
tions (2) and (3) and to loans made in the ordinary course of business,
a corporation may not make a contribution or expenditure or provide
volunteer personal services which services are excluded from the
definition of a contribution pursuant to section 5(3)(a).

"(2) An officer, director, stockholder, attorney, agent, or any other
person acting for a corporation or joint stock company, whether
incorporated under the laws of this or any other state or foreign
country, except corporations formed for political purposes, shall not
make a contribution or expenditure or provide volunteer personal
services which services are excluded from the definition of a contribu-
tion pursuant to section 5(3)(a). A corporation may make an expendi-
ture solely for the establishment and administration of a separate
segregated corporate political education fund to be utilized for the
sole purpose of making contributions to and expenditures on behalf of
candidate committees.

"(3) Contributions to and expenditures from a fund established
under subsection (2) shall be limited to money or anything of ascer-
tainable value obtained through the voluntary contribution of the
employees of the corporation under which the fund was established. A
corporation which is nonprofit may also obtain money or anything of
ascertainable value received through the contributions of members,
who are individuals, of that corporation. The fund may not make a
contribution or expenditure by utilizing money or anything of ascer-
tainable monetary value obtained by using or threatening to use job
discrimination or financial reprisals, or obtained as condition of
employment.

"(4) A person who knowingly violates this section is subject to
section 176." MCLA 169.95; MSA 4.1701(95).

[23] Section 5(1) of the act defines "contribution" as follows:

" 'Contribution' means a payment, gift, subscription, assessment,
expenditure, contract, payment for services, dues, advance, forbear-
ance, loan, donation, pledge or promise of money or anything of
ascertainable monetary value, whether or not conditional or legally
enforceable, or a transfer of anything of ascertainable monetary value
to a person, made for the purpose of influencing the nomination or
election of a candidate, or for the qualification, passage, or defeat of a
ballot question. An offer or tender of a contribution is not a contribu-
tion if expressly and unconditionally rejected or returned." MCLA
169.5(1); MSA 4.1701(5)(1).

[24] Section 7(1) of the act defines "expenditure" as follows:

" 'Expenditure' means a payment, donation, loan, pledge, or prom-

tion or election of a candidate, or for the qualification, passage, or defeat of a ballot question.[25] The specific question is whether this prohibition provides unequal protection of the laws or infringes upon the right to freedom of expression and assembly as guaranteed by Const 1963, art 1, §§ 1, 2, 3, and 5.[26]

It is our opinion that corporate contributions or expenditures for the purpose of influencing the nomination or election of a candidate may be constitutionally prohibited in order to preserve the integrity of the electoral process. However, we would view the prohibition of corporate contributions or expenditures for the purpose of influencing the qualification, passage, or defeat of a ballot question as an unconstitutional abridgement of freedom of speech and press as guaranteed by art 1, § 5.

1. *Equal Protection.*

Corporations have been prohibited from contrib-

---

ise of payment of money or anything of ascertainable monetary value for goods, materials, services, or facilities in assistance of, or in opposition to, the nomination or election of a candidate, or the qualification, passage, or defeat of a ballot question. An offer or tender of an expenditure is not an expenditure if expressly and unconditionally rejected or returned." MCLA 169.7(1); MSA 4.1701(7)(1).

[25] Section 2(2) defines "ballot question" as follows:

" 'Ballot question' means a question which is submitted or which is intended to be submitted to a popular vote at an election whether or not it qualifies for the ballot." MCLA 169.2(2); MSA 4.1701(2)(2).

[26] Const 1963, art 1, §§ 1, 3, and 5 are quoted in fn 9, *supra.*

Section 2 states:

"No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation."

uting to electoral campaigns in Michigan since 1913, the year in which the corrupt practices act[27] passed. The legislative intent in prohibiting financial involvement of corporations in the elective process was to prevent the use of corporate funds to impose undue influence upon elections.[28] Large aggregations of capital controlled by a few persons could have a significant impact upon the nomination or election of a candidate. The possibility of misuse of corporate assets by persons acting on behalf of uninformed or unwilling shareholders and the attempts at influence or importunity which might be exerted upon a successfully elected candidate by a contributing corporation represent abuses which the passage of the corrupt practices act sought to eliminate.

The state's interest in preserving the integrity of the elective process must be balanced against the assumed right to free expression of an artificial entity (*i.e.,* a corporation) regarding the candidacy of persons seeking election to public office. Recognizing that the state must show a compelling interest[29] to justify interference with the fundamental right of freedom of speech or press, it is our opinion that this test is met and that the Legislature can exercise its power to insure the integrity of the elective process by prohibiting any

---

[27] As relating to corporate contributions, 1913 PA 109, § 14, now MCLA 168.919; MSA 6.1919:

"No officer, director, stockholder, attorney, agent or any other person, acting for any corporation or joint stock company, whether incorporated under the laws of this or any other state or any foreign country, except corporations formed for political purposes, shall pay, give or lend, or authorize to be paid, given or lent, any money belonging to such corporation to any candidate or to any political committee for the payment of any election expenses whatever."

[28] *People v Gansley,* 191 Mich 357; 158 NW 195 (1916), decided by an equally divided Court.

[29] *Williams v Rhodes,* 393 US 23, 31; 89 S Ct 5; 21 L Ed 2d 24 (1968).

corporate contributions or expenditures made for the purpose of influencing either the nomination or election of a candidate. We need not discuss further those circumstances under which corporations may be afforded First Amendment protection.

The prohibition against corporate contributions or expenditures for such purposes does not violate their right to equal protection under the law as guaranteed by art 1, § 2. The United States Supreme Court in *Buckley, supra,* recently restated the established principle that:

"[A] 'statute is not invalid under the Constitution because it might have gone further than it did,' *Roschen v Ward,* 279 US 337, 339 [49 S Ct 336; 73 L Ed 722 (1929)], that a legislature need not 'strike at all evils at the same time', *Semler v Dental Examiners,* 294 US 608, 610 [55 S Ct 570; 79 L Ed 1086 (1935)], and that 'reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind,' *Williamson v Lee Optical Co,* 348 US 483, 489 [75 S Ct 461; 99 L Ed 563 (1955)]."[30] (105.)

It is our opinion that restricting the application of § 95 to corporations alone did not constitute a violation of equal protection of the law.

## 2. *Ballot Questions.*

We believe a significant distinction exists between corporation contributions or expenditures made for the purpose of influencing the nomination or election of a candidate and, on the other hand, corporate contributions or expenditures made for the purpose of expressing a position or opinion concerning a public issue which may in-

---

[30] *Katzenbach v Morgan,* 384 US 641, 657; 86 S Ct 1717; 16 L Ed 2d 828 (1966).

clude the qualification, passage or defeat of a ballot question. Though *Buckley* did not address ballot-question campaigns, the Court determined that expenditures for communication of views and opinions about *public issues* are constitutionally protected. Political expression must be afforded the broadest protection in order "to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people".[31] That our discussion involves corporations and not individuals does not render inapplicable our society's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open".[32]

Contributions or expenditures by corporations to communicate their positions or opinions concerning ballot questions serve to enlighten the public and encourage an informed decision-making process.[33] Such contributions or expenditures create no danger of incurring obligations from an elected official to a major contributor. The right of the public to be informed is a paramount consideration in seeking to preserve the free exchange of ideas in the market place.[34]

A ballot question may affect the assets, the conduct, or, indeed, the very existence of a corporation. Especially in such cases, the corporation is deserving of a public forum to express its position or opinion, much the same as the public has a right to hear those same matters.[35]

---

[31] *Monitor Patriot Co v Roy,* 401 US 265, 272; 91 S Ct 621; 28 L Ed 2d 35 (1971).

[32] *New York Times Co v Sullivan,* 376 US 254, 270; 84 S Ct 710; 11 L Ed 2d 686 (1964).

[33] *First National Bank of Boston v Attorney General,* 362 Mass 570; 290 NE2d 526 (1972); *Schwartz v Romnes,* 495 F2d 844 (CA 2, 1974).

[34] *Red Lion Broadcasting Co, Inc v FCC,* 395 US 367; 89 S Ct 1794; 23 L Ed 2d 37 (1969).

[35] *Cf. People v Gansley, supra.*

It is our opinion that insofar as § 95 interferes with the right of the public to hear divergent views of public importance by prohibiting corporations from making contributions or expenditures for the purpose of communicating its opinion concerning ballot questions, it is violative of Const 1963, art 1, § 5. We make no judgment upon the extent to which art 1, § 5, protects the right of corporations to freely express their ideas in other contexts.

## CERTIFIED QUESTION V—CONSTITUTIONALITY OF CHAPTER 3

We are asked to decide whether § 101 of the act in chapter 3[36] constitutes an appropriation for private purposes passed by the Legislature in violation of art 4, § 30 of the Michigan Constitution.

Section 30 of article 4 provides:

"The assent of two-thirds of the members elected to and serving in each house of the legislature shall be required for the appropriation of public money or property for local or private purposes."

Since the act was enacted upon a vote of less than two-thirds of the members of each house, and since we have concluded that § 101 is an appropriations bill in our discussion of certified question VI, the only remaining question is whether § 101 constitutes an appropriation for private purposes. If it is such an appropriation, § 101 is invalid under art 4, § 30.

At the outset, it should be recognized that the term public purpose should not be narrowly construed by the courts, for the determination of what

---

[36] MCLA 169.101; MSA 4.1701(101).

constitutes a public purpose for which an appropriation of public money may be made is primarily the responsibility of the Legislature.

As stated in *Gregory Marina, Inc v Detroit,* 378 Mich 364, 394; 144 NW2d 503 (1966):

"[D]etermination of what constitutes a public purpose involves considerations of economic and social philosophies and principles of political science and government. Such determinations should be made by the elected representatives of the people."[37]

The fact that certain individuals benefit from the appropriation does not necessarily imply that the appropriation is lacking a public purpose. The question is whether society at large has an interest in having those individuals benefited. *Gaylord v Gaylord City Clerk,* 378 Mich 273, 299–300; 144 NW2d 460 (1966).

In this regard, it is highly relevant that the method of financing presidential elections established in the Federal Election Campaign Act of 1971, 26 USCA 9001, which is analogous to the provision before us, was held by the United States Supreme Court to be well within the "general welfare" clause of the United States Constitution, art I, § 8, in *Buckley v Valeo,* 424 US 1; 96 S Ct 612; 46 L Ed 2d 659 (1976):

"[P]ublic financing of Presidential elections as a means to reform the electoral process was clearly a

---

[37] This quotation is from the opinion written by then Chief Justice Thomas M. Kavanagh, concurred in by Justices Black and Smith. Justice Adams, while dissenting on other grounds, agreed with Chief Justice Kavanagh's statement of the rule:

"I agree that the determination of what constitutes a public purpose is primarily a legislative function and that there has been no abuse by the legislature of that function in its determination that the construction and operation of marinas is within the broad concept of public purposes." 378 Mich 364, 409.

choice within the granted power. It is for Congress to decide which expenditures will promote the general welfare: '[T]he power of Congress to authorize expenditure of public moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution.' [Citations omitted.] * * * In this case, Congress was legislating for the 'general welfare'—to reduce the deleterious influence of large contributions on our political process, to facilitate communication by candidates with the electorate, and to free candidates from the rigors of fundraising." (90–91.)

Similarly, the Michigan Legislature has determined that public financing of gubernatorial elections is for the general welfare of the public, and it is well within the Legislature's powers to so determine.

Chapter 3 may be said to have any of the following beneficial public purposes:

1. To allow gubernatorial candidates to become less dependent upon financial support from special-interest groups, thus promoting the appearance and reality of an executive with the welfare of the public at large in mind.

2. To encourage greater participation in gubernatorial campaigns by reducing financial obstacles for candidates with less fundraising abilities, and by enhancing the importance of smaller contributions.

3. To promote the dissemination of political ideas to the electorate by gubernatorial candidates who have been encouraged to campaign for the governorship.

We can only conclude that chapter 3 of the act, specifically § 101, does not constitute an appropriation for a local or private purpose, and thus did not require a two-thirds majority in both houses for passage under art 4, § 30.

Such conclusion is entirely consistent with prior decisions of this Court regarding the nature of a public purpose. As noted in *Gaylord v Gaylord City Clerk, supra,* p 299, a case which held that a Municipal Industrial Aid Financing Program involving the issuance of bonds to finance the construction of private industrial plants had a public purpose, the concept of public purpose has been construed quite broadly in Michigan:

"Michigan cases have steadily broadened the concept of public purpose. In *Miller v Michigan State Apple Commission,* 296 Mich 248 [296 NW 245 (1941)], a State tax on apples, which was used to promote sale of Michigan apples, was upheld because stimulation of the State's apple industry would be beneficially reflected throughout the State. In *Hays v Kalamazoo,* 316 Mich 443 (169 ALR 1218) [25 NW2d 787 (1947)], the expenditure of general funds of a city for membership in the Michigan Municipal League, a private nonprofit corporation established to advise and lobby for cities and villages in the State, was upheld as being for a public purpose. In *Sommers v Flint, supra* [355 Mich 655; 96 NW2d 119 (1959)], a transfer of city property to the Federal government, without consideration, for use as an armory was upheld, based upon mutuality of obligation between the United States and the city in the field of national defense."

See also *Gregory Marina, Inc v Detroit, supra,* holding that the construction of marinas in which boatwells would be leased under non-transferable, perpetually renewable leases was a public purpose.[38]

---

[38] Most of the cases holding that the Legislature had made appropriations for private purposes are older cases which apparently took a narrower view of public purpose than the more recent cases cited above. *See Michigan Corn Improvement Ass'n v Auditor General,* 150 Mich 69; 113 NW 582 (1907) (an appropriation to a private association working for the improvement of corn crops was an unconstitutional attempt to devote public funds to a private purpose); *Michigan Sugar*

In sum, given the broad powers of the Legislature to determine public purpose, and the clear relationship between the goals of § 101 and the public welfare, there is little doubt that there has been no contravention of art 4, § 30 in the enactment of § 101 by less than a two-thirds majority in both houses.

## CERTIFIED QUESTION VI—CONSTITUTIONALITY OF SECTION 101

Section 31, article 4 of the Michigan Constitution of 1963 provides in pertinent part as follows:

"The general appropriation bills for the succeeding fiscal period covering items set forth in the budget shall be passed or rejected in either house of the legislature before that house passes any appropriation bill· for items not in the budget except bills supplementing appropriations for the current fiscal year's operation."

*Co v Auditor General,* 124 Mich 674; 83 NW 625 (1900) (an appropriation to pay bounties to manufacturers of beet sugar was unconstitutional as authorizing taxation for a private purpose); *Allen v Board of State Auditors,* 122 Mich 324; 81 NW 113 (1899) (an appropriation to compensate an individual wrongfully convicted of a crime was for a private purpose).

There is one relatively recent opinion holding that the Legislature had appropriated for a private purpose in violation of art 4, § 30. In *Advisory Opinion re Constitutionality of PA 1966, No 346,* 380 Mich 554; 158 NW2d 416 (1968), the Court held that the act creating the Michigan State Housing Development Authority was in part valid and in part invalid as an appropriation for private purposes. Specifically, the Court held that the appropriation for the creation and administration of the Housing Authority was for a public purpose, but that the appropriations to the housing development fund and the capital reserve sinking fund were not for a public purpose. The housing development fund was to be used to make loans and advances to private corporations engaged in housing development. The capital reserve sinking fund was to be used to repay bonds issued for the same purpose.

This holding is not inconsistent with the result we reach today since the goals of chapter 3 are more closely and clearly related to the welfare of the public at large than the provision overturned in *Advisory Opinion re Constitutionality of PA 1966, No 346, supra.*

The Michigan Legislature passed several general appropriation bills after it passed the political reform act.

We are asked in certified question VI whether § 101 of the act is an appropriation bill within the meaning of art 4, § 31. If § 101 is an appropriation bill, it is invalid as having been passed prior to the passage of general appropriation bills.

Art 4, § 31 defines an appropriation bill as follows:

"Any bill requiring an appropriation to carry out its purpose shall be considered an appropriation bill."

Our central question therefore is whether the political reform act "[requires] an appropriation to carry out its purpose".

Little analysis is needed to demonstrate that the central purpose of chapter 3 of the act, and § 101 in particular, requires an appropriation. That purpose is to help finance gubernatorial campaigns with state funds through a voluntary check-off system from the state income tax, § 101(2), the establishment of a state campaign fund through the transfer of an amount equal to the sum checked off by taxpayers to that fund, § 101(4), and the granting of authority to the state treasurer to issue warrants on the state campaign fund to pay appropriate amounts of money to qualified gubernatorial candidates, § 102(5). Therefore, § 101 constitutes an appropriation bill which is invalid under the provisions of art 4, § 31 in that it was enacted prior to certain general appropriation bills. See also *Boards of County Road Commissioners v Board of State Canvassers,* 50 Mich App 89, 95; 213 NW2d 298 (1973), *aff'd* 391 Mich 666; 218 NW2d 144 (1974), and MCLA 21.9; MSA 3.289.

Irrespective of the fact that § 101 was violative of art 4, § 31 in that it was passed before certain general appropriation bills, § 101 could only serve as an appropriation for one fiscal year under the rationale of *Board of Education of Oakland Schools v Superintendent of Public Instruction,* 392 Mich 613, 620; 221 NW2d 345 (1974).

In *Oakland,* dealing with a statute which purported to be an appropriation bill, but which did not take effect during the ensuing fiscal year,[39] we held that "any provision that does not take initial effect during the ensuing fiscal year is intended to function only as an authorization—an intention to appropriate".

The Court felt that such construction avoided conflict with art 4, § 31, for if such a provision were to be effective as an appropriation, the Legislature would be unable to match revenues with appropriations as is required under the Constitution.

Section 101(4) presents a very similar situation. That section reads as follows:

"(4) An amount equal to the amounts designated under subsection (2) each year is appropriated from the general fund of the state to the state campaign fund. The amounts appropriated under this section shall not revert to the general fund but shall remain available to the state campaign fund for distribution without fiscal year limitation except that any amounts remaining in the state campaign fund on December 31 immediately following a gubernatorial general election shall revert to the general fund."

This provision is a continuing appropriation, *i.e.* an appropriation that does take effect in the ensu-

---

[39] Under Michigan law, the "ensuing fiscal year" is the fiscal year commencing July 1 and closing June 30. *See Oakland,* 392 Mich 618, fn 4.

ing fiscal year, but which by its terms continues to appropriate beyond that fiscal period.[40]

After the ensuing fiscal year, in which revenues can be matched with the appropriation, the conflict with art 4, § 31 created by such a statute is identical with that created by the type of provision found in *Oakland;* in both situations, the budgetary procedure required by the constitutional provision becomes impossible.

Therefore, under the rationale of *Oakland,* there can be an appropriation to the state campaign fund, only for the ensuing fiscal year but not thereafter, appropriations necessarily being made on a year-to-year basis.

CERTIFIED QUESTION VII—FINANCIAL DISCLOSURE

We are asked in certified question VII whether sections 131[41] and 132[42] which require the filing of certain financial information constitute "an invasion of the rights of privacy, or do they violate the equal protection clause or the prohibition against unreasonable searches and seizure". Section 131 specifies the individuals who must file and describes the procedures for filing and the penalties for failure to comply. Section 132 describes the information which must be disclosed by every individual who must file. Persons violating either section may be subjected to a fine not exceeding $1,000, up to 90 days in jail, and may be prohibited from assuming the duties of public office or from receiving compensation from public funds or both.[43]

---

[40] *See Oakland,* 392 Mich 620, fn 5.

[41] MCLA 169.131; MSA 4.1701(131).

[42] MCLA 169.132; MSA 4.1701(132).

[43] §§ 175, 180; MCLA 169.175, 169.180; MSA 4.1701(175), 4.1701(180).

The initial question we address concerns whether §§ 131 and 132 violate the equal protection clause of our Constitution. Those opposed to constitutionality argue that these sections:

"impose the same burdensome disclosure requirements on all public officials, without regard to their geographical jurisdiction or official duties." Brief of Michigan State Grange, et al., p 41.

Their argument is that the statute is overinclusive because it:

"imposes a burden upon a wider range of individuals than are included in the class of those tainted with the mischief at which the law aims." Tussman & tenBroek, *The Equal Protection of the Laws,* 37 Calif L Rev 341, 351 (1949).

The analysis of an overbroad classification differs from the more common equal protection challenge to separate classifications. While separate classifications are subjected to challenge on the basis that there is no legitimate state reason for making a differentiation between members of the separate classes, the question that must be answered in an overbroad classification case is: Is the state's grouping of all individuals into a single class rationally related to the furtherance of a legitimate state interest. It is as reprehensible for the law to separately classify individuals who ought to be treated equally as it is for the law to fail to separately classify individuals who ought to be treated differently. While the drawing of lines need not be done with "mathematical nicety", the lines must be drawn for some rational reason.

We proceed with our analysis of the lines drawn and the burden imposed. Section 131 places into a

single class individuals with vastly differing areas of responsibility and influence and totally differing constituencies, both as to size and geographical location. The act requires the same degree of financial disclosure of the Governor, the Mayor of Grand Rapids, a county road commissioner in Montmorency County, a member of the State Board of Horology, a member of the Michigan Bean Commission, or a city clerk, among others. They have different spheres of influence; some are empowered with wide discretion in matters of great significance while others perform only ministerial functions over rather routine matters. Logic alone must lead us to the conclusion that the possibilities for conflicts of interests of these various governmental officials are also of different proportions and the information required to be disclosed should reflect this fact.

The burden imposed concerns public disclosure of an individual's private financial affairs. At this juncture it is both convenient and necessary for us to depart from the analysis of the equal protection problem in order to discuss the right to privacy issue.

This Court has long recognized privacy to be a highly valued right. *De May v Roberts*, 46 Mich 160; 9 NW 146 (1881). No one has seriously challenged the existence of a right to privacy in the Michigan Constitution nor does anyone suggest that right to be of any less breadth than the guarantees of the United States Constitution.

The United States Supreme Court has recognized the presence of constitutionally protected "zones of privacy". *Griswold v Connecticut*, 381 US 479, 484; 85 S Ct 1678; 14 L Ed 2d 510 (1965); *Roe v Wade*, 410 US 113; 93 S Ct 705; 35 L Ed 2d 147 (1973). These zones have been described as being

within "penumbras" emanating from specific constitutional guarantees. Often mentioned as a basis of the right to privacy are the 1st, 3rd, 4th, 5th, 9th and 14th Amendments to the United States Constitution. The people of this state have adopted corresponding provisions in art 1 of our Constitution.

We reject the notion that an individual's entry into the governmental arena waives the right to privacy. *New York Times Co v Sullivan,* 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964), insures the public an opportunity to make nonmalicious criticisms of a public official's official conduct. Those seeking public office are well advised to recall the words of Harry S. Truman:

"If you can't stand the heat, stay out of the kitchen!"

Public officials must recognize their official capacities often expose their private lives to public scrutiny. However, we see a great difference between "unavoidable exposure" and "compelled disclosure". We reject any notion that the *Sullivan* case can be read to require public officials to fuel the fires of those who seek to roast them.

The right to privacy includes certain activities which are fundamental to our concept of ordered liberty. Rights of this magnitude can only be abridged by governmental action where there exists a "compelling state interest". *Roe, supra,* 152, 155. *Kropf v Sterling Heights,* 391 Mich 139, 157–158; 215 NW2d 179 (1974).

It is argued by those seeking to uphold the constitutionality of these provisions that disclosure of specified governmental official's financial affairs is necessary to further a legitimate and compelling state interest. We agree. Disclosure assists in pre-

serving the integrity of the political process. It is legitimate for the Legislature to provide a means for effectively investigating possible conflicts of interest. Disclosure requirements promote integrity, fairness, and public confidence in government as well as providing the citizens with information concerning an officeholder's integrity and fitness for office.

Having determined that the state is possessed of a compelling interest in seeking disclosure of financial affairs, we must establish whether the means employed are sufficiently narrow. Even when motivated by a compelling reason, the abridgment of such rights must be accomplished by the least intrusive method.

"[T]he governmental purpose * * * cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton v Tucker,* 364 US 479; 81 S Ct 247; 5 L Ed 2d 231 (1960).

The encroachment must be shown to be necessary to, not merely rationally related to, the accomplishment of the state interest. *Griswold, supra,* 497.

With regard to at least some of the individuals listed in § 131 most of the information required by § 132 to be disclosed appears to be sufficiently narrow and necessary to the accomplishment of the state interest. The act contains certain threshold limits. Small amounts of income, debt, real estate and gifts need not be disclosed. Even when the threshold limits are reached the exact numerical amounts or values need not be disclosed to the public (except for the information required by subsection [e] which is to be filed with the Secre-

tary of State and remain confidential, the exact value of income, real estate, or gifts need not be disclosed at all). The term gift as defined in § 121(5) does not include gifts received from members of the individual's immediate family or certain other close relatives. There are also broad exceptions to the required disclosure of creditors. Accounts payable, debts arising out of retail installment transactions or from loans made by financial institutions in the ordinary course of business, loans from a relative within the third degree of consanguinity, and land contracts that have been properly recorded with the county clerk or the register of deeds need not be included.

A notable exception exists regarding the language in § 132(1) which requires individuals to report information concerning "what they know or have reason to know" about members of their immediate family. In our opinion this language and similar language contained in § 132(2) present very real problems of vagueness. As the statute imposes criminal penalties for violations, due process requires that the statute provide adequate notice to a person of ordinary intelligence of conduct that is illegal. We believe the quoted language lacks the specificity required to alert individuals to the responsibility imposed upon them to discover the information required to be disclosed. While we agree with those who argue in support of the constitutionality of this section that immediate family members were included in the disclosure provisions in order to prevent the individual from circumventing the disclosure provisions by transferring an interest held by that individual to a member of his immediate family, we believe the same result may be accomplished with more precise language. See Ill Rev Stat 1971 ch 127, § 604a-

102; *Lehrhaupt v Flynn,* 129 NJ Super 327; 323 A2d 537, 541 (1974).

However, despite the fact that we find the disclosure provision to be sufficiently narrow for some officials, we are convinced that for many others listed in § 131 the disclosure requirements mandate production of information which is not "necessarily related" to achieving the state interests involved. For those minor officials whose sphere of influence is geographically limited or whose functions are routine and ministerial, we find the disclosure provisions of § 132 to be overbroad.

Similar considerations led the California Supreme Court in the case of *Carmel-By-The-Sea v Young,* 2 Cal 3d 259, 269; 85 Cal Rptr 1; 466 P2d 225 (1970), to strike down a 1969 political reform act containing financial disclosure provisions.

"The financial disclosure requirements of the statute now before us encompass indiscriminately persons holding office in a statewide agency regardless of the nature or scope of activity of the agency, as well as those whose offices are local in nature * * * . No effort is made to relate the disclosure to financial dealing or assets which might be expected to give rise to a conflict of interest; that is, to those having some rational connection with or bearing upon, or which might be affected by, the functions or jurisdiction of any particular agency, whether statewide or local, or on the functions or jurisdiction of any particular public officer or employee."

In light of our comments concerning the overbreadth of the intrusion into the right to privacy of some of the officials listed in § 131, we return to our analysis of the equal protection question. We find the single class created by § 131 to be an arbitrary, capricious, and unreasonable grouping and, therefore, a violation of the equal protection

clause. The grouping indiscriminately combines officials without regard to their function or jurisdiction. We are unable to discover a single thread connecting all the named officials.

As we conclude that the classification is overbroad, the entire statutory scheme set forth in §§ 131 and 132 for disclosure by public officials must fall.

Finally, §§ 131 and 132 are challenged on the basis that they violate the constitutional provisions against unreasonable searches and seizures. This section of the Constitution does not forbid all searches and seizures but only all *unreasonable* searches and seizures. *Elkins v United States,* 364 US 206, 222; 80 S Ct 1437; 4 L Ed 2d 1669 (1960).

"We have recently held that 'the Fourth Amendment protects people, not places,' * * * and wherever an individual may harbor a reasonable 'expectation of privacy,' * * * he is entitled to the free from *unreasonable* governmental intrusion." *Terry v Ohio,* 392 US 1, 9; 88 S Ct 1868; 20 L Ed 2d 889 (1968). (Emphasis added.)

In our discussion concerning the right to privacy, we found that the government could make reasonable intrusions upon that right. Therefore, if we assume, *arguendo,* that compelled disclosure is a search, we believe that it would be a reasonable search if it is accomplished by the least intrusive method.

### CERTIFIED QUESTION VIII—DISCLOSURE AS OATH

The Legislature requests us to test the constitutionality of §§ 131 and 132 against the provisions of art 11, § 1 of the Constitution. That article contains the oath of office required to be taken and

subscribed by all legislative, executive and judicial officers. This section also provides that:

"No other oath, affirmation, or any religious test shall be required as a qualification for any office or public trust."

We find no conflict between §§ 131 and 132 of the act and this section of the Constitution.

The oath, affirmation or religious test provision contained in art 11, § 1 was designed to protect a right which the citizens of our state and nation hold most dear: freedom of belief. While the government may legitimately impose restrictions upon the expression of one's beliefs, it is wholly without power to compel or require a citizen to adopt a belief. Cases involving "loyalty oaths" fall within that category.

Essentially in both *Dapper v Smith,* 138 Mich 104; 101 NW 60 (1904), and *Harrington v Secretary of State,* 211 Mich 395; 179 NW 283 (1920), the Court upheld the right of belief of the citizen in the face of the government attempt to force the citizen to make a decision. In *Harrington,* the Court held that the government could not force a potential candidate to choose a political philosophy. In *Dapper,* the potential candidate could not even be forced to decide if he wanted to be a candidate. The situation we have in this case is vastly different from that in *Dapper* and *Harrington.* Sections 131 and 132 do not require the potential candidate to form a belief or choose between differing thoughts. The financial disclosure requirements are not analogous to the filing of an oath, affirmation, or religious test. We believe they are more analogous to affidavits required by MCLA 168.557; MSA 6.1557 (change of

name) and MCLA 168.558; MSA 6.1558 (name, address, residency, etc.). We find no violation of art 11, § 1 by §§ 131 and 132.

## CERTIFIED QUESTION IX—LOBBY DISCLOSURE: FREE SPEECH

The issue raised by certified question IX is whether chapter 5,[44] which contains the lobbyist disclosure provisions, removes political power inherent in the people; restricts the right of people to consult for the common good; inhibits the instructing of representatives; restricts or inhibits the petitioning of government for the redress of grievances; or abridges freedom of speech in violation of Const 1963, art 1, §§ 1, 3, or 5.

Chapter 5 requires lobbyists and lobbyist agents[45] to register annually with the Secretary of State and to pay a $5 registration fee. At that filing, the lobbyist must disclose the names of all of his lobbyist agents in the state, and lobbyist agents must declare the name, address, and nature of business of everyone who is compensating them.

---

[44] Section 12(3) of the act defines "lobbying" as follows:

" 'Lobbying' means communicating directly or soliciting others to communicate with an official in the exclusive branch or an official in the legislative branch for the purpose of influencing legislative or administrative action. Lobbying does not include communications by a person to its own paid members, or shareholders even though the purpose of communications is to solicit such members or shareholders to communicate with officials; or the providing of technical information by a person who is not a lobbyist or an employee of a lobbyist solely at the request of an official in the executive branch or an official in the legislative branch." MCLA 169.12(3); MSA 4.1701(12)(3).

[45] Sections 12(4) and 12(5) state:

"(4) 'Lobbyist' means a person whose expenditures for lobbying are more than $1,000.00 in value in any 12-month period, or the state or political subdivision which contracts for a lobbyist agent.

"(5) 'Lobbyist agent' means a person who receives compensation, reimbursement of actual expenses, or both, in a combined amount in excess of $1,000.00 in any 12-month period for lobbying." MCLA 169.12(4), 169.12(5); MSA 4.1701(12)(4), 4.1701(12)(5).

Quarterly reports must be filed by each lobbyist detailing:

(1) all expenditures in any way related to lobbying, including expenses for advertising and mass mailings;

(2) all financial transactions between the lobbyist and public officials or their families over $50, except those in the ordinary course of business;

(3) each contribution or membership fee of $500 or more in the current fiscal year paid to a lobbyist whose primary purpose is lobbying, with the name, address, and occupation of the source of such funds; and

(4) a brief description of the lobbying activities engaged in.

Public officials are to be notified when their names are included in a lobbyist's report and quarterly and annual summaries of these reports are to be published and given wide public dissemination.

Lobbyists are to obtain and preserve for five years all the documentation necessary for the information required in these reports filed with the Secretary of State. Lobbyist agents are in turn responsible for furnishing their employer (the lobbyist) with a full accounting on a quarterly basis of all lobbying and expenditures related thereto which must be included in the lobbyist's quarterly report. The information disclosed in these reports may not be used for commercial purposes, although it can be used for the solicitation of campaign contributions.

Lobbyist agents may not accept employment on a contingent fee basis and gifts by lobbyists and lobbyist agents to public officials and their families are prohibited. In general, public officials are prohibited from accepting compensation for lobbying.

Fines and penalties are imposed for violations of the chapter's provisions.

We find with regard to regulation of lobbyist activities involving *direct* communication with officials in the executive and legislative branches that the disclosure provisions are not violative of the constitutional provisions cited above. We find more troublesome, however, the disclosure provisions as they relate to the "soliciting of others to communicate" with officials. Resolution of any problems which may arise respecting the interpretation and application of this language is better deferred until the issues are raised in a factual context.

The right of freedom of speech, of association, the right to consult for the common good, to instruct representatives, to petition the government, are all fundamental. As we have indicated elsewhere in this opinion, when the government seeks to regulate a fundamental right, the regulation may be upheld only if justified by a compelling state interest. While requiring lobbyists to disclose information constitutes regulation of fundamental rights, compelling state interest justifies such regulation. Both the electorate and public officials have a right to be informed of those interests represented by lobbyists. The constitutionality of legislation regulating the activities of lobbyists[46] has been upheld by the United States Supreme Court. *United States v Harriss,* 347 US 612; 74 S Ct 808; 98 L Ed 989 (1954). However, those challenging the constitutionality of Michigan's act argue that when chapter 5 is closely scrutinized it is vague and overbroad.

Because criminal penalties attach to violations of this statute, fair notice must be provided to a

---

[46] Federal Regulation of Lobbying Act, 60 Stat 812, 839 (1946); 2 USC 261–270.

person of ordinary intelligence as to the conduct proscribed. The Michigan statute sufficiently delineates the type of conduct regulated: (1) that a person spend more than $1,000 in a 12-month period; (2) communicating directly with an executive branch or legislative official; or (3) soliciting others to such communication; and that (4) such communication be for the purpose of influencing legislative or administrative action. The statute is more descriptive of the types of communication regulated than the Federal lobbying act discussed in *Harriss, supra.* Legislative and administrative actions are sufficiently defined in §§ 12(1) and 2(1), respectively. Thus, we conclude that chapter 5 is sufficiently specific to withstand a vagueness challenge.

The statute upheld in *Harriss* differs from the Michigan act in two respects:

First, the Federal lobbying act as construed by the United States Supreme Court in *Harriss* covered only the so-called professional lobbyists. Chapter 5 requirements of the Michigan legislation apply not only to those who are paid or pay others, but also those who lobby in their own behalf, provided their expenditures for such activities exceed $1,000. Second, unlike the Federal lobbying act, the requirements of chapter 5 are not restricted to direct communications between the lobbyist or lobbyist agent and the public official. Under § 12(3) lobbying is also defined as "soliciting others to communicate with an official in the executive branch or an official in the legislative branch for the purpose of influencing legislative or administrative action".

In our opinion, the rights of legislators, public officials and the public to know the source of monies expended to influence governmental action

applies equally to professional lobbyists and those representing their own interests. By imposing the $1,000 threshold, the Legislature has helped to insure that only significant expenditures need be disclosed. In order to avoid manifest overbreadth, however, the words "soliciting others to communicate" with an official "for the purpose of influencing legislative or administrative action" must be interpreted to mean express and direct requests to so communicate. Even as so construed, the validity of restraints placed upon such requests is more appropriately tested in the factual context of an actual case or controversy.

CERTIFIED QUESTION X—LOBBY DISCLOSURE: EQUAL
PROTECTION

The final question is whether restrictions placed upon lobbyists and lobbyist agents deny them equal protection of the law. This issue concerns the definition of "lobbyist" contained in § 12(4) and the exceptions to the definition of "lobbyist" carved out by § 12(6).[47] These exceptions include political parties, § 12(6)(d), religious organizations, § 12(6)(f), and persons whose annual expenditure or compensation for lobbying is $1,000 or less, §§ 12(4) and 12(5). None of the above classifications constitutes a violation of equal protection. Political parties have long been subject to distinct and separate regulatory treatment.[48] The Michigan Constitution recognizes that religious groups have been traditionally accorded special status. Const 1963, art 1, § 4. Finally, we cannot say in this factual vacuum that the $1,000 threshold is wholly without rationality. See *Buckley v Valeo, supra,*

---

[47] MCLA 169.12(4), 169.12(6); MSA 4.1701(12)(4), 4.1701(12)(6).

[48] Michigan Election Law, MCLA 168.1 *et seq.;* MSA 6.1001 *et seq.*

82–83. In our opinion, the foregoing restrictions do not constitute a denial of equal protection of the law.

WILLIAMS, COLEMAN, FITZGERALD, and LINDEMER, JJ., concurred.

KAVANAGH, C. J. *(dissenting)*. A majority of the Court having expressed the opinion that this legislation is ineffective as violating the one-object limitation, the expression of any other or further opinion at this time is inappropriate.

RYAN, J., concurred with KAVANAGH, C. J.

LEVIN J. *(dissenting)*. The Constitution permits an advisory opinion as to the constitutionality of legislation only "after it has been enacted into law". Const 1963, art 3, § 8.

The words "after it has been enacted into law" were proposed as an amendment on the floor by delegate (now Secretary of State) Austin who stated that the purpose was to "prevent the supreme court from getting involved until the legislative process was completed and they would be working with a law rather than some bills or proposals for legislation." 1 Official Record, Constitutional Convention 1961, p 1548.

This further opinion, on questions 2–10, may assist the Legislature in its consideration of proposals for enactment of a revision of the act declared unconstitutional in *Advisory Opinion on Constitutionality of 1975 PA 227 (Question 1)*, 396 Mich 123; 240 NW2d 193 (1976). However, in expressing an opinion regarding the constitutionality of a matter again on the legislative agenda, the Court becomes involved in the legislative process contrary to the purpose of the after-enactment limitation. Further advice should not be given until the legislative process is completed.