Wilder, J. (dissenting).
I concur in full with Chief Justice MARKMAN 's dissent. I write separately, however, to address an additional, alternative basis for rejecting the proposal submitted by Voters Not Politicians (VNP). The VNP proposal requires that applicants to the independent citizens redistricting commission attest under oath either that they affiliate or do not affiliate with one of the two major political **146 parties. Because the proposal abrogates the Oath Clause of Const 1963, art 11, § 1, which forbids requiring additional oaths or affirmations as a qualification for public office, VNP was required to republish that provision on its petitions. It is uncontested that VNP failed to do so. Because strict compliance with the republication requirement was required, an order of mandamus should issue directing the rejection of the VNP proposal.[1]
I. THE VNP PROPOSAL[2]
The VNP proposal, art 4, § 6, provides, in pertinent part:
(2) Commissioners shall be selected through the following process:
(A) The Secretary of State shall do all of the following:
* * *
(III) require applicants to attest under oath that they meet the qualifications set forth in this section; and either that they affiliate with one of the two political parties with the largest representation *300 in the Legislature (hereinafter, "major parties"), and if so, identify the party with which **147 they affiliate, or that they do not affiliate with either of the major parties . [Emphasis added.][3 ]
Under the VNP proposal, the Secretary of State is required to eliminate the applications that are incomplete. Therefore, if an applicant fails to attest under oath regarding his or her political party affiliation, the applicant is ineligible to be selected for a position on the commission. See VNP proposal, art 4, § 6(2)(D)(I).
II. BACKGROUND REGARDING REPUBLICATION REQUIREMENTS
Both Const 1963, art 12, § 2[4] and MCL 168.482(3)[5] require that ballot proposals that would amend Michigan's Constitution republish any existing constitutional provisions that the proposed amendment would alter or abrogate. The petition republication requirement serves "to inform the petition-signer, should he **148 sign," of the effect "an initiated proposal will have upon an existing constitutional provision (or provisions) should that proposal receive electoral approval." Carman v . Secretary of State , 384 Mich. 443, 454, 185 N.W.2d 1 (1971) (emphasis omitted). Such "dissemination of necessary information to the public" is considered both "wholesome and desirable." Id ." Const 1963, art 12, § 2 and MCL 168.482(3) together establish the requirements for publishing existing constitutional provisions." Protect Our Jobs v. Bd. of State Canvassers , 492 Mich. 763, 778, 822 N.W.2d 534 (2012).
In Stand Up For Democracy v. Secretary of State , 492 Mich. 588, 822 N.W.2d 159 (2012), this Court held that a petition must fully observe mandatory statutory provisions concerning a petition's form requirements. In Protect Our Jobs , 492 Mich. at 778, 822 N.W.2d 534, this Court held that the strict-compliance principle articulated in Stand Up For Democracy applied with "equal force" to the requirement that a petition republish any existing constitutional provision that the proposed amendment, if adopted, would alter or abrogate.
Protect Our Jobs , which involved the proper interpretation of "alter" and "abrogate" in the context of a ballot proposal to amend the Constitution, id . at 772-773, 761 N.W.2d 210, reaffirmed the principles articulated in Ferency v. Secretary of State , 409 Mich. 569, 297 N.W.2d 544 (1980), and *301 Sch. Dist. of City of Pontiac v. City of Pontiac , 262 Mich. 338, 247 N.W. 474 (1933), Protect Our Jobs , 492 Mich. at 778-781, 822 N.W.2d 534. "[A]n existing provision is only altered when the amendment actually adds to, deletes from, or changes the wording of the provision," and "an amendment only abrogates an existing provision when it renders that provision wholly inoperative ." Protect Our Jobs , 492 Mich. at 773, 822 N.W.2d 534 (emphasis added). **149 With respect to abrogation-the only type of change asserted to be at issue by plaintiffs in the instant case- Protect Our Jobs held that republication is required if the proposed change "would essentially eviscerate an existing provision." Id . at 782, 822 N.W.2d 534. The standard for abrogation was articulated as follows:
Our caselaw establishes that an existing provision of the Constitution is abrogated and, thus, must be republished if it is rendered "wholly inoperative." An existing constitutional provision is rendered wholly inoperative if the proposed amendment would make the existing provision a nullity or if it would be impossible for the amendment to be harmonized with the existing provision when the two provisions are considered together. That is, if two provisions are incompatible with each other, the new provision would abrogate the existing provision and, thus, the existing provision would have to be republished. An existing provision is not rendered wholly inoperative if it can be reasonably construed in a manner consistent with the new provision, i.e., the two provisions are not incompatible.
Determining whether the existing and new provisions can be harmonized requires careful consideration of the actual language used in both the existing provision and the proposed amendment. An existing provision that uses nonexclusive or nonabsolute language is less likely to be rendered inoperative simply because a proposed new provision introduces in some manner a change to the existing provision. Rather, when the existing provision would likely continue to exist as it did preamendment, although it might be affected or supplemented in some fashion by the proposed amendment, no abrogation occurs. On the other hand, a proposed amendment more likely renders an existing provision inoperative if the existing provision creates a mandatory requirement or uses language providing an exclusive power or authority because any change to such a provision would tend to negate the specifically conferred constitutional requirement. [ Id . at 782-783, 822 N.W.2d 534 (citations omitted; emphasis added).]
**150 Protect Our Jobs involved four distinct ballot proposals to amend the Michigan Constitution, none of which altered an existing provision of the Constitution. However, the Court held that the ballot proposal at issue in Citizens for More Michigan Jobs v Secretary of State abrogated an existing constitutional provision. Id . at 773, 822 N.W.2d 534. That proposed amendment would have allowed for the construction of eight new casinos in Michigan and would have compelled the issuance of a liquor license to each of the eight casinos. Id . The Court held that the amendment's requirement that the casinos "shall be granted" liquor licenses "render[ed] wholly inoperative the 'complete control of the alcoholic beverage traffic within this state' afforded to the Liquor Control Commission under ... Const 1963, art 4, § 40." Id . Because Article 4, § 40 was required to be republished, the fact that it was not was "fatal to the proposed amendment" and mandamus was denied. Id . at 791, 822 N.W.2d 534.
*302 III. THE OATH CLAUSE
Const 1963, art 11, § 1 provides:
All officers, legislative, executive and judicial, before entering upon the duties of their respective offices, shall take and subscribe the following oath or affirmation: I do solemnly swear (or affirm) that I will support the Constitution of the United States and the constitution of this state, and that I will faithfully discharge the duties of the office of ................ according to the best of my ability. No other oath, affirmation, or any religious test shall be required as a qualification for any office or public trust. [Emphasis added.][6 ]
**151 Throughout Michigan history, this constitutional provision has largely remained the same. Const 1835, art 12, § 1 ; Const 1850, art 18, § 1; and Const 1908, art 16, § 2 all provided that "[n]o other oath, declaration or test shall be required as a qualification for any office or public trust." Const 1963, art 11, § 1 narrowed the provision from "test" to "any religious test."
In Dapper v. Smith , 138 Mich. 104, 101 N.W. 60 (1904), the issue before the Court was the constitutionality of a Kent County law that denied a spot on the ballot to any candidate unless the candidate declared an oath of the fact that he was a candidate for the office. The oath prohibited voters from choosing a candidate who declined to seek office on his own initiative but was "willing to consent to serve his State or his community in answer to the call of duty when chosen by his fellow citizens to do so ...." Id . at 105, 101 N.W. 60. The Court noted that the constitutional provision was "not one designed for the benefit of the aspirant for public station alone; it is in the interest of the electorate as well." Id . The Court found the law was unconstitutional, in violation of Article 18, § 1, which provided that "no other oath, declaration, or test shall be required as a qualification for any office or public trust." Id . at 105-106, 101 N.W. 60. The Court could not "escape the conclusion that the provision in question does most seriously impede the electors in the choice of candidates for office, and that it is in conflict with the provisions of section 1 of article 18 of the Constitution ." Id . (emphasis added).
In Harrington v. Secretary of State , 211 Mich. 395, 395-396, 179 N.W. 283 (1920), the Court relied on **152 Dapper to strike down a statutory amendment that required primary candidates to sign an affidavit stating that the candidate was a member of a certain political party, naming the political party, and indicating that the candidate would "support the principles of that political party of which he is a member, if nominated and elected[.]" (Quotation marks and citation omitted.) The Court noted the fallacy of requiring additional oaths before a candidate even becomes a candidate: "Where is the logic of saying that when elected the officer cannot be subjected to any test oath other than the constitutional oath of office, but before he can be a candidate he must subject himself to a different test oath or he cannot be a candidate, and is therefore in practical effect barred from holding the office?" Id . at 397, 179 N.W. 283. The Secretary of State urged that Dapper be overruled, but the Court declined, concluding that "the amendment contravenes the constitutional provision above quoted." Id . at 399, 179 N.W. 283. *303 IV. ANALYSIS
In the instant case, the Court of Appeals panel agreed with plaintiffs that the VNP proposal is "not an oath of office, but is merely an affirmation that the applicant satisfies the commissioner qualifications, which are enumerated in a separate section, § 6(1)," reasoning that Advisory Opinion on Constitutionality of 1975 PA 227 , 396 Mich. 465, 510, 242 N.W.2d 3 (1976), supported this conclusion. Citizens Protecting Michigan's Constitution v. Secretary of State , 324 Mich. App. 561, ----, --- N.W.2d ----, 2018 WL 2746592 (2018) (Docket No. 343517) (CPMC ), slip op at 27. In that case, the Court held that a financial disclosure oath did not violate Article 11, § 1 ; rather, it was more akin to nominating **153 petition affidavits under MCL 168.558 and former MCL 168.557. Advisory Opinion , 396 Mich. at 510-511, 242 N.W.2d 3. However, the plain language of the VNP proposal requires applicants to attest under oath that they meet the qualifications "set forth in this section; and " indicate their party affiliation, if any. VNP proposal, art 4, § 6(2)(A)(III) (emphasis added). The political party affiliation question is undoubtedly a requirement of the attestation under oath in addition to the qualifications of § 6 (1). The Court of Appeals, without explanation, simply declared that a financial disclosure oath is analogous to a political affiliation attestation, and in doing so, it ignored language from Advisory Opinion that distinguished Dapper and Harrington and is particularly germane to this case:
Essentially in both Dapper v. Smith and Harrington v. Secretary of State , the Court upheld the right of belief of the citizen in the face of the government attempt to force the citizen to make a decision . In Harrington , the Court held that the government could not force a potential candidate to choose a political philosophy. In Dapper , the potential candidate could not even be forced to decide if he wanted to be a candidate . The situation we have in this case is vastly different from that in Dapper and Harrington . Sections 131 and 132 [of 1975 PA 227] do not require the potential candidate to form a belief or choose between differing thoughts . The financial disclosure requirements are not analogous to the filing of an oath, affirmation, or religious test. We believe they are more analogous to affidavits required by MCLA 168.557 (change of name) and MCLA 168.558 (name, address, residency, etc.). We find no violation of art 11, § 1 by §§ 131 and 132. [ Advisory Opinion , 396 Mich. at 510-511, 242 N.W.2d 3 (citations omitted; emphasis added).]
In this case, the Court of Appeals' analysis made no reference to Dapper whatsoever. Moreover, the panel distinguished Harrington on the basis that in its view, **154 "the oath required by the VNP Proposal relates only to the information on the application and does not bind a candidate once he or she becomes a commissioner ." CPMC , --- Mich. App. at ----, slip op at 27, --- N.W.2d ---- (emphasis added). However, whether the oath in the instant case, unlike Harrington , does not purport to bind a candidate into the future has no bearing on whether an oath or affirmation exists as a qualification for office in the first instance. Nothing in the language of Article 11, § 1 limits the provision to "binding" oaths, affirmations, or religious tests.[7] Rather, the language of *304 Article 11, § 1 bars additional oaths or affirmations as a requirement for office-"[n]o other oath, affirmation, or any religious test shall be required as a qualification for any office or public trust." (Emphasis added.)
The plain language of the VNP proposal requires applicants to make a choice when filling out the application-they must attest under oath that they affiliate with the Democratic Party, Republican Party, or indicate that they affiliate with neither party. If the applicant fails to meet this qualification, the application is discarded and the applicant is rendered categorically ineligible for a commissioner position. As this Court stated in Advisory Opinion , Dapper and Harrington stand for the proposition that Article 11, § 1 precludes any requirement that requires a potential candidate to form a belief or choose between differing thoughts as a qualification for office. Under **155 Dapper and Harrington , commissioner applicants may not be forced to attest, under oath, to which political party they most closely affiliate with, if any.
VNP cites two cases for the proposition that "appointment to public bodies" may be based upon "consideration of political affiliation in cases where the requirement in question is designed to ensure representation of diverse political interests, and does not exclude persons of any particular political persuasion from participation." In other words, defendants argue that the plain language of Article 11, § 1 may be set aside in the interests of political diversity. However, these cases are easily distinguishable.
VNP first cites Attorney General ex rel Connolly v. Reading , 268 Mich. 224, 256 N.W. 432 (1934). In that case, electors of the city of Detroit sought a writ of mandamus to compel the city election commission to comply with a law requiring that not more than 50% of the election inspectors be of the same political party. Id . at 226, 256 N.W. 432. The election commissioners refused to comply with the law, claiming that it was an unconstitutional test.[8] Id . The Court rejected the commissioners' argument. Id . at 232, 256 N.W. 432. In doing so, the Court quoted Volume 20 of the Corpus Juris, which (citing Attorney General v. Bd. of Councilmen of the City of Detroit , 58 Mich. 213, 24 N.W. 887 (1885) ) stated that " 'such provisions have been held unconstitutional as making political opinions a condition to holding public office, but in [other jurisdictions] where the question has been raised it has been held that such provisions do not establish such a political test of office as is **156 repugnant to the Constitution but ... rather a rule for the guidance of the appointing power .' " Id . at 227-228, 256 N.W. 432 (emphasis added). The Court distinguished the statutory language pertaining to election inspectors from the language at issue in the Corpus Juris, Dapper , and Harrington , but found it "identical" to the language in numerous other statutes creating various other boards. Id . at 228-229, 256 N.W. 432. Instead of requiring a person to declare a party affiliation in order to be an election inspector, the statute was similar to other statutes requiring "that candidates for election to any certain public office shall be limited to a certain number from each *305 political party." Id . at 231, 256 N.W. 432.[9]
Connolly thus had nothing whatsoever to do with oaths or affirmations-the language of the statute at issue did not require anyone to make an oath or affirmation-and the case does not support VNP's claim that its proposal does not abrogate Article 11, § 1.
The other case cited by defendants is Attorney General ex rel Fuller v. Parsell , 99 Mich. 381, 58 N.W. 335 (1894). In that case, the attorney general filed a quo warranto action against Eugene Parsell, the warden of the state house of correction and reformatory at Ionia. Id . at 382, 58 N.W. 335. Parsell refused to give up his office even after he was removed by the board of control.[10] Id .
**157 Parsell raised six points in defense of the quo warranto action against him; the second point is the one most relevant to this case and reads as follows:
In his second rejoinder he alleges, substantially, that after the passage of Act No. 118 [of the Public Acts of 1893], the Governor, by virtue of said act, assumed to appoint the board of control, requiring of each member thereof the political test named and mentioned in section 2, and by reason thereof appointed two Republicans and one Democrat,-the said Governor himself being ex officio member of said board, and also being a Republican,-and that the said Governor would not have appointed the Democratic member of said board had he been a Republican, or the Republican members had they been Democrats, but that he made said appointment of these parties upon said board because of their political belief and for political reasons; and as to this the respondent puts himself upon the country. [ Id . at 383-384, 58 N.W. 335.]
The Court rejected his claim as follows:
The issue made by the second rejoinder is one purely of law, and raises the question of the constitutionality of Act No. 118, Laws of 1893. The constitutionality of the act was passed upon in Fuller v. Attorney General , and the act held valid. It is true the exact point made here was not presented in that case, but we see no reason for holding it unconstitutional for the reasons assigned. It is now contended that because the Governor, in making the appointments on a new board, acting under section 2 of the act, appointed from each political party, such appointments are void. That section provides that the board shall consist of three members, to be appointed by the Governor, and not more than two of such members so appointed shall be of the same political party. The Governor, by the same section, is made ex officio member of the board. This provision of the act, we think, was passed for a salutary purpose, and was within the province of the Legislature. We know of no provision of the Constitution of the State which it violates. The Governor was bound by this section to appoint each **158 member of the board, and, in making the selection, to choose no more than two from the same political party. This provision was carried out, as admitted by the respondent. It is true that the *306 appointments may have been made for political purposes, and because of the political beliefs of the parties appointed; but this could not make the appointments void, and no issue of fact could be framed thereon. But, if this were not so, the title to their office cannot be attacked here. They are at least de facto officers. [ Id . at 387-388, 58 N.W. 335.]
Of interest, it should be noted that Parsell did not claim a violation of Const 1850, art 18, § 1, the predecessor of Const 1963, art 11, § 1. Indeed, there was not even a claim that the board members were required to swear additional oaths or affirmations as a qualification of their appointment. In short, Parsell had nothing to do with the constitutional provision at issue and is wholly irrelevant to the analysis.
The majority argues on VNP's behalf that the oath here is merely a qualification for office. In the context of the "test" prohibition contained in former versions of Article 11, § 1, our caselaw has long held that having "special qualifications" for an office (e.g., requiring that a candidate live in a municipality for a specified period of time or be a member of the state bar) does not violate this particular constitutional provision. See Attorney General v. Macdonald , 164 Mich. 590, 129 N.W. 1056 (1911). In the context of the "oath" prohibition, this Court has acknowledged that a statutory requirement that a candidate for office of county commissioner of schools file an affidavit or other proof showing his eligibility for such office did not conflict with the "no other oaths" language of the Constitution. Tedrow v. McNary , 270 Mich. 332, 335, 258 N.W. 868 (1935). The affidavit in Tedrow passed constitutional muster because it was "simply prima facie evidence that the **159 candidate [was] educationally qualified to discharge the duties of the office. No statement in any way affecting his rights as a citizen, or his religious or political affiliations, need appear therein." Id . The VNP proposal impermissibly inquires into the political affiliations of the oath-taker, and therefore, in my judgment, Tedrow does not support the conclusion that the VNP oath may be characterized as merely another qualification.
As the majority points out, judicial candidates must confirm by affidavit their qualifications for office. The affidavit of candidacy largely reflects a list of special qualifications: that the judge (1) is an incumbent judge and is domiciled within the relevant jurisdiction, (2) is a candidate for that office at the primary election, (3) is licensed to practice law in the state of Michigan, (4) has been admitted to the practice of law for at least five years, and (5) will not have attained the age of 70 years by election day. See Const 1963, art 6, § 19 ; MCL 168.544b. Again, these qualifications, like the education qualification in Tedrow , stop short of inquiring into a candidate's political affiliations and therefore are distinguishable from the VNP oath.
Perhaps most persuasive is the fact that VNP has not characterized its oath as a qualification. That is a characterization argued by the majority on behalf of VNP. The VNP proposal considers the oath separately and distinctly from the qualifications for a commissioner's position. The commissioner qualifications are listed in Article 4, § 6(1) of the VNP proposal: "[e]ach commissioner shall" be registered to vote in Michigan, not otherwise disqualified for appointed or elected office by the Michigan Constitution, and not currently, or in the past 6 years have been (or related to anyone who has been) (1) a declared candidate, elected official, or part of a governing body for federal, state, or local office; (2) a **160 paid consultant or employee of any elected official, political candidate, or political action committee; (3) a legislative employee; (4) a registered lobbyist; or (5) an unclassified state employee. The VNP *307 oath requirement is placed in the next subsection, VNP proposal, art 4, § 6(2), which outlines the commissioner selection process.
The VNP oath may be more accurately characterized as a political test, but at any rate it is certainly an oath-which in my view directly conflicts with the plain letter of the Constitution. Const 1963, art 11, § 1 is crystal clear-"[n]o other oath [or] affirmation ... shall be required as a qualification for any office or public trust." This appears to be absolute language. Because Const 1963, art 11, § 1 places an absolute ban on additional oaths or affirmations required as a qualification for office, it is analogous to an existing provision that "creates a mandatory requirement or uses language providing an exclusive power or authority because any change to such a provision would tend to negate the specifically conferred constitutional requirement." Protect Our Jobs , 492 Mich. at 783, 822 N.W.2d 534. Equally as important, Article 11, § 1 is unlike an existing provision "that uses nonexclusive or nonabsolute language" deemed "less likely to be rendered inoperative" in Protect Our Jobs . Protect Our Jobs , 492 Mich. at 783, 822 N.W.2d 534. Because the VNP proposal, which requires applicants to attest under oath regarding their political affiliation, appears to render the absolute language of Article 11, § 1"wholly inoperative," Protect Our Jobs , 492 Mich. at 773, 822 N.W.2d 534, it therefore constitutes an abrogation that is subject to the republication requirements of Const 1963, art 12, § 2 and MCL 168.482(3).[11]
**161 V. CONCLUSION
The VNP proposal requires that applicants to the independent citizens redistricting commission attest under oath that they either affiliate or do not affiliate with one of the two major political parties. Because the proposal would abrogate the Oath Clause of Const 1963, art 11, § 1, which forbids requiring additional oaths or affirmations as a qualification for public office, VNP was required to republish that provision on its petitions, as required by Const 1963, art 12, § 2 and MCL 168.482(3). It is uncontested that VNP failed to do so. Because strict compliance with the republication requirement was required, an order of mandamus should issue directing the rejection of the VNP proposal.
Kurtis T. Wilder
Brian K. Zahra

The majority argues that Kelly 's discussion of the distinction between an amendment and a revision is dictum. I respectfully disagree. Kelly held that the proposal at issue could not be placed on the ballot because "[t]he petition on its face is not in the form required by law ...." Kelly , 259 Mich. at 216, 242 N.W. 891. However, Kelly also went on to hold that the proposal could not be placed on the ballot because it was a revision rather than an amendment. Id . at 223-224, 242 N.W. 891. In other words, Kelly held that the proposal could not be placed on the ballot for two independent reasons. That does not mean that one of those reasons is dictum, because it is well established that "where there are two grounds, upon either of which an appellate court may rest its decision, and it adopts both, the ruling on neither is obiter, but each is the judgment of the court, and of equal validity with the other." United States v. Title Ins. & Trust Co. , 265 U.S. 472, 486, 44 S.Ct. 621, 68 L. Ed. 1110 (1924) (quotation marks and citation omitted). See also Massachusetts v. United States , 333 U.S. 611, 623, 68 S.Ct. 747, 92 L. Ed. 968 (1948) (Where a case has "been decided on either of two independent grounds" and "rested as much upon the one determination as the other," the "adjudication is effective for both."); Richmond Screw Anchor Co., Inc. v. United States , 275 U.S. 331, 340, 48 S.Ct. 194, 72 L. Ed. 303 (1928) ("It does not make a reason given for a conclusion in a case obiter dictum, because it is only one of two reasons for the same conclusion."). Furthermore, while the discussion in Kelly in support of the first rationale is less than two pages, the discussion in support of the second rationale is eight pages. There are no grounds for considering the first rationale binding precedent but not the second.

The majority does not explain why it does not believe Pontiac Sch. Dist. to be binding precedent, other than to note that Pontiac Sch. Dist. "summarily" rejected the argument that the proposed amendment constituted a revision. Whatever the length of its analysis, Pontiac Sch. Dist. is fully consistent with the text of the Constitution, other Michigan precedent, and, indeed, as discussed later, even with the majority's application of its own standard that it adopts today. Moreover, in its discussion of this case, the majority somehow finds it relevant to observe, "[W]e decline to accept ... that the only purpose of our constitutional provisions is to make the government run as efficiently as possible." (Quotation marks and citation omitted.) To whom exactly is the majority purporting to respond by this observation out of nowhere? Who exactly is asserting to the contrary? Certainly, no one on this dissenting opinion or in the Pontiac Sch. Dist. opinion. While the majority accuses this dissent of "labor[ing] to give its rule some provenance by repeatedly citing the age of the cases [it] relies upon," why exactly should that not be thought a relevant consideration? Why exactly should it not be thought relevant that the best and most authoritative and most consistent precedents of this Court and of our Court of Appeals are of a reasonably settled and longstanding character? If there is any "laboring" undertaken in our respective opinions, it seems as if the lion's share takes place within the confines of the majority opinion in distinguishing in secondary ways what are inarguably the most compelling precedents of this state-imperfect as we have acknowledged these to be. And as we have argued elsewhere, even the majority itself, by its specific inquiries into the impact of the VNP proposal, inquires of things that are largely consistent with these precedents, although it does so in pursuit of a new test-one that lacks any provenance within the judicial precedents of this state.

Justices Cavanagh, Weaver , and myself joined in a concurrence affirming the Court of Appeals' decision because the RMGN proposal "clearly cannot be reasonably communicated to the people in 'not more than 100 words,' " id . at 961, 755 N.W.2d 157 ( Cavanagh, Weaver , and Markman , JJ., concurring), while Justice Weaver wrote a separate concurrence criticizing the Court of Appeals for reading California law into Michigan law, id . at 962, 755 N.W.2d 157 ( Weaver , J., concurring). Justice Corrigan , joined by Chief Justice Taylor and Justice Young , wrote a concurrence in support of the Court of Appeals, id . at 964, 755 N.W.2d 157 ( Corrigan , J., concurring), and Justice Kelly wrote a dissent that would have remanded to the Board of Canvassers for the submission of a 100-word statement of the purpose of the initiative, id . ( Kelly , J., dissenting). The RMGN proposal would have effected an array of changes to the Constitution, including reductions in numbers of state legislators and judges, granting citizen standing for certain environmental lawsuits, and limiting lobbying activities.
The majority contends that this opinion "engages in revisionist legal history when it asserts that our precedents in this area have established 'longstanding standards' on this point that are 'consistent and compatible with each other, as well as with what is required by our Constitution' " because "if the standard set forth in Laing and Pontiac Sch. Dist. and the Court of Appeals decisions in Citizens and Protect Our Jobs was so clear and longstanding on this point, one wonders why this Court refused to adopt it in 2008 in Citizens , instead issuing a highly unusual order leaving this area of law in a state of limbo." While I cannot speak as to the intentions of any other justice in 2008, I can offer that I joined a short concurring statement in that case that held that the proposal before the Court was not an amendment under Const 1963, art 12, § 2, for what I viewed as the simplest and most straightforward of reasons-it could not be reasonably summarized in 100 words or less; it was far too expansive in its reach and impact. Nothing in that statement suggested in any way that I rejected the standard set forth in the instant case or any other standard, merely that in the context of what was then also an election emergency, there was simply no time-and even more importantly, no need -to assess or to apply the more nuanced and difficult standard articulated today. In the present case, on the other hand, the "100 words or less" standard is, in my judgment, the standard that is more difficult to apply and one that was not addressed by the lower court. Furthermore, given that the Citizens standard was derived from both Kelly and Pontiac Sch. Dist. , each of which constitutes binding precedent, and given that Citizens itself was a published opinion and thus constitutes a further binding precedent, the law was hardly left in any "state of limbo," even within the context of the difficult and exigent circumstances that the majority should well understand attend our election emergency cases. The majority also opines that the Citizens standard "comes from a line of California caselaw ...." In part, this is so, and in part, it is not, because the majority in Citizens largely relied on Kelly and Pontiac Sch. Dist. ; while it did also rely on California law, it did not do so in any different manner than does the majority in the present case.

Since statehood, Michigan has vested the legislative power in a bicameral legislature consisting of a Senate and a House of Representatives. See Const 1835, art 4, § 1 ; Const 1850, art 4, § 1 ; Const 1908, art 5, § 1 ; Const 1963, art 4, § 1. Moreover, the federal government and every state government with the exception of one also provide for a bicameral legislature. US Const, art I, § 1 ; see Rodriguez, Turning Federalism Inside Out: Intrastate Aspects of Interstate Regulatory Competition , 14 Yale L & Pol'y Rev 149, 163 (1996).

Indeed, the same language in Const 1963, art 12, § 2 requiring "a statement of the purpose of the proposed amendment" proceeds in the same sentence to require that this statement be "expressed in not more than 100 words," and this effectively imposes another limitation on the breadth of an amendment. In Citizens , 482 Mich. at 960, 755 N.W.2d 157, three justices joined in asserting that "[t]his language establishes a clear limitation on the scope of constitutional amendments under § 2." In other words, a proposal that "cannot be reasonably [and presumably fully] communicated to the people in 'not more than 100 words' " cannot be considered an amendment for purposes of Const 1963, art 12, § 2. Id . at 961, 755 N.W.2d 157. However, the Court of Appeals in the instant case held that "[t]he above language does not impose, or even suggest, limitation on the scope of a voter initiative proposing a constitutional amendment." CPMC , --- Mich. App. at ----, slip op at 14, --- N.W.2d ----. While I disagree with the Court of Appeals on that point, I do agree with the Court that the distinctive purposes and processes set forth by §§ 2 and 3 (amendments and revisions) further impose a limitation on the scope of proposed voter-initiated changes to our Constitution.

Article 12 actually sets forth a third way by which our Constitution can be modified, i.e., an amendment by legislative proposal and a vote of electors, Const 1963, art 12, § 1, but that mode of constitutional change is not at issue in this case.

Although I recognize that this is not a bright-line test and that reasonable people, and judges, will sometimes disagree as to whether a particular constitutional proposal does or does not call for "fundamental" change, this test nonetheless is compatible with constitutional text, our judicial precedents, and the evident purposes of the alternative processes contained in Article 12. Furthermore, this is hardly the first area of the law in which a court has been required to address whether something is "fundamental" or not. See, e.g., AFT Mich. v. Michigan , 497 Mich. 197, 245, 866 N.W.2d 782 (2015) (stating that whether a law infringes on "fundamental rights" is relevant in the context of a substantive due-process claim); In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38 , 490 Mich. 295, 326, 806 N.W.2d 683 (2011) (stating the same with regard to an Equal Protection Clause claim); McBurney v. Young , 569 U.S. 221, 226, 133 S.Ct. 1709, 185 L. Ed. 2d 758 (2013) ("[T]he Privileges and Immunities Clause protects only those privileges and immunities that are 'fundamental.' "); Slaughter-House Cases , 83 U.S. (16 Wall.) 36, 21 L Ed 394 (1872) (stating the same with regard to the Privileges and Immunities Clause). Principally, however, what is most important in establishing a proper judicial test is not the extent to which it avoids disagreements, or mechanically compels a determination, but the alignment of the test, as best as this can be done, with the underlying legal question to be resolved.

To the extent the majority holds that a proposed change must be "tantamount to creating a new constitution" in order to be considered something other than an "amendment," I strongly disagree and see no constitutional basis for this conclusion. But I see much constitutional basis for the contrary conclusion, namely, that by evaluating the distinctive elements of the initiative and convention processes, one gains reasonable insight as to the distinctive application of each, and therefore a proposal constitutes an "amendment" unless it would "fundamentally" alter the nature or operation of our government. I do not believe the majority's test is warranted by precedent or the text of the Constitution. Although Kelly , 259 Mich. at 217, 242 N.W. 891, does refer to a revision in terms of creating "a new instrument," it proceeds to hold that a "revision suggests fundamental change, while amendment is a correction of detail." In addition, Pontiac Sch. Dist. , 262 Mich. at 345, 247 N.W. 474, held that the proposed change in that case constituted an amendment because it "does not so interfere with or modify the operation of governmental agencies as to render it other than an amendment ...." And Citizens , 280 Mich. App. 273, 761 N.W.2d 210, and Protect Our Jobs , unpub op, each focused on the scope of the proposed changes and the degree to which those changes would interfere with, or modify, the operation of government. Our precedents viewed as a whole do not stand for the proposition that anything short of creating an entirely new constitution must be considered an "amendment." And although the majority's standard on its face certainly appears to be in accord with this flawed proposition, reading the majority opinion as a whole, especially its actual application of its own standard, I do not believe this to be an accurate summation of what the majority itself is engaged in doing in the present case. That is, although the majority employs the "new constitution" language to describe its own standard, its actual analysis of the VNP proposal falls short of inquiring whether it would actually yield a "new constitution." There is considerable room under our Constitution between an "amendment" and the creation of an entirely new constitution.

Given the resemblances between the majority's own standard (or at least its application of that standard) and our state's judicial precedents, it is ironic that the majority would remark that "it would be euphemistic to say that these cases have created a judicial gloss supporting the dissent's reasoning-instead, they appear to us more like a spray-on tan." The majority thus rejects the best and the most enduring relevant precedents of this state in developing its own test, disparages these precedents as tantamount to a "spray-on tan," and then, notwithstanding, proceeds reasonably to apply the very precedents it has both rejected and disparaged. While we respectfully disagree with the majority's ultimate conclusions, we do not find these to be indefensible or outrageous, merely less defensible and less reasonable than those reached in this dissent.

Well said, but less well applied. Does the majority not believe that the "basic threads of [our ] constitution" might be understood as consisting in part of our system of separated powers, checks and balances, and representative self-government?

But Reynolds also held that "[s]o long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature."Id . at 579, 84 S.Ct. 1362. And the Court subsequently held that "the State's policy of maintaining the integrity of political subdivision lines" is a "rational state policy." Mahan v. Howell , 410 U.S. 315, 325, 328, 93 S.Ct. 979, 35 L. Ed. 2d 320 (1973). It also held that a 16.4% deviation from exact population equality did not violate the Equal Protection Clause if it was done in furtherance of such a rational state policy. Id . at 329, 93 S.Ct. 979.